## ALABAMA IRON & RY. CO. et al. v. ANNISTON LOAN & TRUST CO.

### (Circuit Court of Appeals, Fifth Circuit. June 20, 1893.)

### No. 126.

**1.** RECEIVERS—SALE OF CERTIFICATES—RATIFICATION—ESTOPPEL.

The president of a bank in which a receiver kept his deposits, having been authorized by the receiver to sell certain receiver's certificates, made the sale after his authority had been revoked, and caused the amount realized to be credited to the receiver on the books of the bank, and on the receiver's pass book. The receiver did not repudiate the sale, but, on the contrary, drew checks against the deposits, and reported the transactions to the court, which, in the foreclosure decree, recognized the validity of the certificates, and directed that the sale should be made subject thereto. *Held,* that the receiver was estopped to question the validity of the certificates, as against an innocent purchaser.

**2.** SAME.

The fact that the receiver, on afterwards learning that the bank was insolvent, demanded and received from the bank and from the president, personally, certain collateral securities, to protect his deposits, was not a repudiation of the sale, but rather a fresh ratification, and acceptance of the deposits as the proceeds of the sale.

**3.** SAME—RECEIPT OF PROCEEDS—DEPOSITS IN BANK.

The deposits representing the proceeds having been placed in the bank, by the president, in the form of checks, drafts, etc., on other banks, which were in fact duly honored by them, the deposits must be held to have come into the receiver's hands, within the rule which makes the receipt of the proceeds by the receiver a condition precedent to the validity of the certificates, although the bank was never in a condition to pay over any considerable proportion of the deposits to the receiver.

**4.** SAME—ESTOPPEL OF COURT.

Under the circumstances, the court, having recognized the validity of the certificates, and caused the foreclosure sale to be made subject to the lien thereof, was bound to recognize the estoppel of the receiver, as its agent, and to protect the innocent purchaser of the certificates by enforcing the same against the purchaser of the property.

Appeal from the Circuit Court of the United States **for the Northern District of Alabama.**

In Equity. Petition of intervention filed by the Anniston Loan & Trust Company in the foreclosure suit brought by the Central Trust Company of New York against the Sheffield & Birmingham Coal, Iron & Railway Company. The intervener sought to enforce the lien of certain receiver's certificates, as against the purchasers at the foreclosure sale. In the court below there was a decree in favor of the intervener, and an appeal was taken by the Alabama Iron & Railway Company, the Townley Coal & Coke Company, Napoleon Hill, trustee, and James C. Neely, trustee. Decree affirmed.

Statement by LOCKE, District Judge:

On the 15th day of August, 1890, the Anniston Loan & Trust Company filed its intervening petition, claiming payment for five separate receiver's certificates, numbered 8, 9, 10, 11, and 12, issued on 10th day of October, 1889, by Jacob G. Chamberlain, late receiver of the Sheffield & Birmingham Coal, Iron & Railway Company. The intervention set forth that the receiver placed said certificates in the hands of Charles D. Woodson for sale; that the said Woodson, on the 10th October, 1889, sold the same to one Duncan T. Parker, now deceased, for $5,000 for each certificate; that the said Parker paid Woodson said price for the certificates, the same having been placed in Woodson's hands by the receiver to be negotiated and sold by Woodson, with only power and authority to act for and represent said receiver in the matter of the sale of said certificates; that on the 2d November, 1889, Duncan T. Parker sold and delivered the certificates, for the sum of $5,000 each, to the petitioner, the Anniston Loan & Trust Company.

Said petition further sets forth that it was the duty of Chamberlain to pay the semiannual interest on said certificates, being $750, due on 10th April, 1890, at the National Park Bank of New York, and that said interest was not paid. It is further stated in said petition that said receiver duly reported the sale of said certificates as made by said Charles D. Woodson, such report being made to the circuit court of the United States, and that said proceeds had been placed by Woodson, to the credit of said receiver, in the First National Bank of Sheffield, less 6 per cent. commission for selling the same; that on the 3d day of December, 1889, a decree was rendered by said circuit court of the United States, foreclosing the mortgages, and ordering a sale of the property in said original suit, and that the purchasers be required to pay the receiver's certificates, numbered as aforesaid, owned and held by petitioner; that on the 4th January, 1890, the said circuit court made an order modifying the former decree, of 3d December, 1889, authorizing such purchasers of said properties at the foreclosure sale to contest the validity of said certificates so sold by Woodson, and the said modified decree was made after Parker had purchased said certificates from the duly-authorized agent of said receiver, in good faith, for a valuable consideration, and had sold them to petitioner; that on the 21st April, 1890, said property was sold under said decree, and part of the same purchased by Napoleon Hill, trustee, and part by James C. Neely, trustee. Petitioner then prays for relief,—that the amount of said certificates be paid to it by the purchaser of said property.

To this a demurrer was interposed, and on the 12th November, 1890, petitioner amended its intervention, setting forth more specifically the authority given to said Jacob G. Chamberlain, receiver, to issue said receiver's certificates, and stating that the action of Woodson was as the authorized agent of the receiver, in selling said five certificates, and reiterating, in a great measure, what had already been set forth in the original petition. On the 2d December, 1890, respondents renewed their demurrer to the petition and amended petition, which was overruled.

On the 31st January, 1891, respondents filed their answers to the intervention of the Anniston Loan & Trust Company substantially as follows:

They deny that said Chamberlain, receiver, ever engaged Woodson, the president of the First National Bank of Sheffield, Ala., to act as his agent in the negotiation and sale of said receiver's certificates, and allege that Woodson disposed of the same without warrant or authority from Chamberlain, receiver, and contrary to the direct instructions and request of said receiver; that said certificates were not disposed of by Woodson, as alleged in the intervention, on the 10th October, 1889, to one Duncan T. Parker, or any one else, nor were they disposed of for the sum of $5,000 each. And respondents aver that said five certificates were not disposed of by Woodson until after the 13th October, 1889, and that they were then sold, or otherwise disposed of, by Woodson, without authority, and against the express instructions of the receiver, to some person or persons unknown to respondents, and for a price not greater than 75 cents on the dollar, and also call for strict proof that said Duncan T. Parker, or any one in his behalf, ever paid to Charles D. Woodson $5,000 for each of said certificates. And respondents aver that, if the said Parker ever bought the certificates at all from said Woodson, they were bought for a less sum than they were directed by the court to be sold for, and that the purchase of the same was against the order of the court, and against the instructions of the receiver. They further allege that the price paid for said certificates by said Parker, whatever the price may have been, was never turned over or transferred by Parker, or any one for him, to said Woodson nor to said Chamberlain, as receiver. They aver that they were not informed as to what said Parker may have done with said certificates, but deny that Parker sold and transferred said certificates to the intervener for $5,000 each. They also deny that it was the duty of Chamberlain to pay the interest upon said certificates, or that said Chamberlain reported the sale of said certificates, Nos. 1, 2, and 3, and also Nos. 8, 9, 10, 11, and 12, for him, by said Woodson, or that the proceeds were placed to his credit in the First National Bank of Sheffield. Respondents admit, however, that said Chamberlain did report to the court that the proceeds of the five certificates in litigation had been placed by Woodson to the receiver's credit in the First National Bank of Sheffield, less commission for selling same; but respondents aver and show to the court that such statement, made by said receiver, was made through misinformation, and brought about by misrepresentation and misconduct of said Woodson; and that said receiver proceeded to correct said statement in said report so soon as he became aware of the error into which he had been led.

Respondents admit that a decree had been taken on the 3d December, 1889, as alleged in the intervention, and that it was ordered in said decree that the purchaser of the property should pay for said certificates, in addition to the amount bid at the sale of the property. And they further admit the court did on the 4th day of January, 1890, make another decree, modifying and changing the one of December 3, 1889, so as to authorize the purchaser of the property to test the validity of the said five certificates, but deny that Woodson was the agent for the receiver, or that his sale of the said certificates was binding upon the purchaser of the property. They also admit the sale of the mortgaged property on the 21st April, 1890, under the decree, as modified, authorizing the purchaser of the property to contest the validity of the five certificates.

In answer to the amended petition, substantially the same admissions and denials were made as in the answers to the original petition of intervener.

On the 6th March, 1891, an order was entered, by consent, referring the cause to a special master, who on the 3d of August, 1892, filed an extended report upon matters of fact, in substance finding as follows:

That Chamberlain, the receiver, by an order of the court, duly and regularly made, issued receiver's certificates for an amount, in the aggregate, of $150,000. Of these certificates, five, for $5,000 each,—Nos. 8, 9, 10, 11, and 12, inclusive,—the receiver placed in the hands of C. D. Woodson, who was at the time president of the First National Bank of Sheffield, to sell. That these five certificates are the subject of controversy in this suit, and the re-

ceiver was authorized and empowered to sell them at not less than par, less a reasonable amount to be paid for the negotiation of the same, and the proceeds to be applied to the purposes named in the decree. On October 13, 1889, Chamberlain, the receiver, sent a telegram from Atlanta, Ga., to Woodson, at Fifth Avenue Hotel, New York, in the following language: "Do not place receiver's certificates, under any circumstances, as I have given option for their sale. Also, return acceptance of ten thousand dollars to me, at Sheffield, at once. Answer here. J. G. Chamberlain." On the same day, Woodson replied to this telegram as follows: "Telegram received. Will return you the papers as requested. C. D. Woodson." In violation of the instructions contained in this telegram to him, Woodson, on October 14, 1889, sold in New York these five certificates to H. E. Garth, for D. T. Parker,—said Garth, in his testimony, says,—"either for $17,000, or seventy cents on the dollar." And D. T. Parker, on the 21st and 22d of October, 1889, sold them to O. H. Parker. president of the Anniston Loan & Trust Company, for said company, for $22,500, being ninety cents on the dollar. That D. T. Parker purchased from Woodson, and paid him for, the certificates, after the receipt by Woodson of the telegram from the receiver to Woodson, directing him not to dispose of the certificates, and, in effect, countermanding any authority which might previously have been given to him to sell the certificates, but that Parker purchased and paid for the certificates in perfect good faith, relying upon Woodson's reputation for probity and honor. D. T. Parker, it appears, is dead, and also Woodson. The testimony of Garth as to the sale by Woodson to Parker is: "I have been engaged in the banking business for many years, and am now president of the Mechanics' National Bank of this city. I knew C. D. Woodson and D. T. Parker. I purchased of Mr. Woodson three certificates of the Sheffield & Birmingham Coal, Iron & Railway Company, of $5,000 each,—Nos. 1, 2, and 3,—and shortly afterwards bought for Mr. D. T. Parker five certificates, of $5,000 each, from Mr. Woodson. As well as I can remember, they were numbers 8, 9, 10, 11, and 12. Mr. Woodson called at my office with Nos. 1, 2, and 3, and I bought them, paying him 80 cents on the dollar for them; and in about two or three weeks afterwards he called to see me again, and I bought the five for Mr. D. T. Parker, at his (Parker's) request. I believe their numbers were 8, 9, 10, 11, and 12. I paid Mr. Woodson either 70 cents on the dollar, or $17,000, for the five certificates of $5,000 each. Mr. Woodson told me that the receiver of the Sheffield & Birmingham Coal, Iron & Railway Company owed his bank, and gave the certificates to him to sell. I do not know what capacity he was acting in, further than that I knew he was president of the First National Bank of Sheffield, and that he had stated that the receiver was indebted to his bank. I sold the certificates Nos. 1, 2, and 3, that I bought. Those bought for Mr. Parker were handed to him. So far as I know, the legality of the purchase of certificates Nos. 1, 2, and 3 has never been doubted or questioned. I have already stated the price, and about the time when the certificates were purchased. As nearly as I can remember, the first were bought the last of September, and the others the middle of October, 1889. So far as I know, the interest on Nos. 1, 2, and 3 has been paid regularly. I never heard to the contrary. I cannot say how long I knew Mr. Woodson before the purchase of the certificates; probably a year. He was engaged in the banking business. I heard that he had been in the banking business a number of years in Atlanta, Ga., and Sheffield, Ala. I cannot say what his standing was in banking and financial circles in the city of New York. He informed me that his bank was hard up, but was perfectly good. So far as I know, everybody regarded him as thoroughly honest and reliable." The evidence shows that the certificates were regularly sold to the Anniston Loan & Trust Company at 90 cents, and that they still own them. The first notice they had of any question as to them was when they were presented at the bank where interest was payable. It is thus shown that the intervener is a bona fide holder for value, and that the first purchase was, in like good faith, for value.

Upon the question as to whether the receiver ratified the sale by receiving the purchase price, the intervener offered the testimony of the witnesses T. L. Benham, J. R. Jones, and R. W. Austin, and the documentary evidence of

a mortgage from Charles D. Woodson to Jacob G. Chamberlain, receiver, executed October 28, 1889, on real estate in Birmingham, to secure indebtedness of $33,335, due by two notes,—one for $23,500, proceeds of receiver's certificates, and $9,835, proceeds of two acceptances,—both these notes signed, "First National Bank of Sheffield," and "C. D. Woodson;" mortgage from Charles D. Woodson to Jacob G. Chamberlain, receiver, executed November 9, 1889, on real estate in Sheffield and Colbert county, to secure same indebtedness; assignment by said bank to Chamberlain, as receiver, as further security for said indebtedness, of seven notes, aggregating $10,000, given by Henry B. Tompkins and J. M. White to said bank. The testimony of Benham, cashier, and Jones, bookkeeper, of the First National Bank of Sheffield, showed that Woodson made a deposit of money in the bank to the credit of Chamberlain, as receiver, of $17,000, on October 22, 1889; another, of $6,500, November 5, 1889,—and that Woodson said at the time that these deposits were the proceeds of the receiver's certificates. That the bank book shows these entries to the credit of Chamberlain, receiver. That Chamberlain, as receiver, had an account on the books of the bank, and had a pass book, and that these two items,—one for $17,000, and the other for $6,500,—were credited on his pass book. That Chamberlain, as receiver, had to his credit on the books of the bank, November 5, 1889, $25,278.83. That this included the item of $17,000, but not the item of $6,500. That this last item was placed on the pass book by the instance of Woodson, and that Woodson did not exactly explain the debit entry to it. That there were other deposits that Chamberlain, receiver, had made, in addition to these, between the 10th of October and the 5th of November. That he deposited $4,060.28, October 28th, and, same date, $844.45. That these were all the deposits between those dates, and no deposit afterwards. That, after the 9th of November, checks by Chamberlain, receiver, on the following dates, and for the following amounts, were honored, viz.: November 13th, $150.08; November 14th, $235.26; November 15th, $38.43; November 22d, $123.37; November 25th, $20.40; and November 26th, $31. That the receiver was overdrawn in the bank, September 19th, $7,972.50. That the receiver checked out, between October 22d and the time of the suspension of the bank, $2,859.18, and that his check out October 22d, for $576.46, was paid that day. That the deposit of $17,000 was made up of several items. The items were $6,000 and $4,000 charged to W. L. Moody & Co., of New York; $3,000 in the National Bank of Republic, transferred by him to the Burney National Bank of Birmingham, and that bank sent to the First National Bank of Sheffield $3,000 in gold, which was received, and $1,500 and $2,000 charged to the Central National Bank of New York. The total of these amounts aggregates $16,500, which, with the $500 individual check of Woodson, makes $17,000. That these several amounts were recognized and reported by the banks upon which they were drawn, and that their monthly accounts and settlements with his bank showed that these amounts were actually deposited to its credit in said banks, respectively, and that his bank got the benefit of them. That Woodson did deposit October 22, 1889, to the credit of Chamberlain, as receiver, that which was equivalent to $6,500, according to commercial usage under ordinary circumstances. That Chamberlain, as receiver, reported to the court the proceeds of these certificates as on deposit in the bank to his credit, and on December 3, 1889, the court rendered a decree of foreclosure and sale of the property for which the original bill was filed, and by that decree charged the property and its proceeds with the payment of these certificates. That at the same time the bank was insolvent. That Woodson was its president, and that, although the credit was given, part on October 22d, ($17,000,) and balance, ($6,500,) November 9th, yet at no time after the date of either credit was the bank in a condition to have paid any considerable portion of either.

These were the findings of fact by the master, but, as matters of law, he found that the receiver was, by his conduct, so far as he was concerned, estopped from denying the validity of the disposition of these certificates by Woodson, but that the entries and deposits in the bank were not equivalent to a payment by Woodson to the receiver, and that the intervener's claim was, therefore, not a valid claim, and should be disallowed.

To this report the intervener filed exceptions, specifying, under 15 heads, alleged improper rulings. Upon this the case came on, and, being fully heard, the exceptions were sustained, the decision of the special master set aside, and judgment given for the intervener for the full amount of the certificates, with interest, whereupon appellants took an appeal, assigning as error that the court erred in overruling and setting aside the special master's finding and report, and in finding that the five certificates constituted a valid claim and charge against the property, and in giving judgment for intervener.

John B. Knox, for intervener.

Henry B. Tompkins and Brickell, Semple & Gunter, for respondents.

Before LOCKE and BILLINGS, District Judges.

LOCKE, District Judge, (after stating the facts.) The nine grounds of exception assigned, upon examination, resolve themselves into but three principal questions that require examination: Was the Anniston Loan & Trust Company a·bona fide holder of the $25,-000 of receiver's certificates, the subject-matter of this litigation? Had they been legally disposed of, so that any title had been acquired by said company? And was the receiver—and the appellants —estopped from setting up the invalidity of said certificates? The first question is, without hesitation, answered in the affirmative. In our view of the other two questions, we deem it unnecessary to consider separately each of the grounds, as the determination of the one question, whether or not the certificates were a valid claim against the property, must include all reasons for such conclusion. Nor do we consider it necessary to examine and review the minutiae of the peculiar circumstances of the delivery and sale of the certificates, or whether or not the testimony which was introduced to show the revocation of the power given to Woodson to sell, and which was objected to, and argued at length, was admissible. It is conceded by the report of the master—in which view we agree—that, as far as the action of the receiver could do it, the sale was ratified by him; and the only question remaining is whether the proceeds ever came into the hands of the receiver, as to justify the court in recognizing the sale, and confirming the validity of the lien given by the certificates.

The principle of law, that, in order to hold the body of the trust liable for the receiver's certificates, the proceeds must come to the hands, custody, or control of the receiver, is not questioned by either party; and it is conceded that the receiver acted in perfect good faith in accepting a credit with the bank, and protecting himself and such deposit, as far as possible, by taking securities, and that he is estopped from repudiating the sale, and denying the receipt of the proceeds. The sale was not repudiated by the receiver upon his learning of it, nor does it appear that he made demand for the money, as money, when informed that the proceeds had been placed to his credit in the bank where he had been doing his banking business for a long time, to the extent of many thousand dollars, and where he still made deposits of large amounts,

and continued drawing checks, for several weeks.    The embarrass-ment of the receiver, and the ground of claim on the part of the purchaser, so far as they have any, arise from the failure of the bank, and not from any insufficiency of deposit of proceeds.    The funds were received by him precisely as they are received by the banks at the clearing house, and precisely as they are received by one depositor who is paid by the check of another depositor; that is, the receipt of the amount appropriated and placed to his credit by the bank, with his acceptance and acknowledgment.    Had he received a check upon the said bank, duly certified by the cashier, and had the same placed to his credit could it have been considered more a valid payment?    Levy v. Bank, 4 Dall. 234.

The amount to his credit from the sale of the certificates was in his possession and control, the same as the amount he had deposited since the sale.    It is true that subsequently, when he learned that there might be a question of the solvency of the bank, he demanded and obtained from the president of the bank personal notes, mortgages, and collateral securities, to secure his deposits.    But this, in our opinion, so far from tending to invalidate the sale of the certificates, was a fresh and conclusive ratification of the sale, and of the acceptance of the deposit of the proceeds.    The giving of notes secured by mortgage or collaterals, by a bank, to protect a deposit, is no evidence that there has not been a money transaction, or valid credits received.

Is the court bound to recognize the estoppel of its agent, and protect the parties who have been, from the force of events subsequent to their transaction, and unforeseen by them, forced into the position occupied by the petitioners herein?    The learned judge in the court below considered that it is, and with this view the peculiar circumstances of the case induce us to agree.    This sale had been recognized and treated as valid and binding by both the receiver and the court until it was too late for the purchasers to protect themselves from loss.    Koontz v. Bank, 16 Wall. 196; Oddie v. Bank, 45 N. Y. 735; Bank v. Burkhardt, 100 U. S. 686; From the 5th of November, when the last credit of $6,500 was given to Chamberlain on the books of the bank, until the 4th of January, neither the validity of the sale, nor the integrity of the receipt of the proceeds, were questioned.    The receiver continued drawing checks against the fund thus accumulated, and the decree was drawn, presented, and signed, recognizing all as valid.    The report of the sale and deposit of proceeds made to the court; the drawing, presenting, and consent to signing of the decree of foreclosure, in which the validity of these certificates was plainly and distinctly recognized,—were all done with full knowledge and understanding of the circumstances subsequently set up.

The appellants herein purchased the property subject to any liens which might be held to be valid on account of the existence of these outstanding certificates, of which they had full knowledge, and they now hold by assignment, or by buying in at foreclosure sales in suits brought by themselves, the securities which were con-

sidered, when taken, abundantly ample to protect the deposits. Under these circumstances, to permit them to successfully contest their payment, and cast the burden of any possible loss upon the innocent purchasers, who had not been informed of any error or mistake of theirs until too late to protect themselves, would, it seems to us, as expressed in the emphatic language of the learned judge in the court below, "bring discredit on the temple." We fail to find any error in the action of the circuit court, and the judgment is affirmed, with costs.