

Opinions of the United
States Court of Appeals
for the Third Circuit

7-5-1994

# FMC Corp. v. US Dept of Comm.

Precedential or Non-Precedential:

Docket 92-1945

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"FMC Corp. v. US Dept of Comm." (1994). *1994 Decisions.* Paper 69.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/69

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 92-1945


FMC CORPORATION

v.

UNITED STATES DEPARTMENT OF COMMERCE;
RONALD BROWN, SECRETARY OF
COMMERCE, in his official capacity;
UNITED STATES OF AMERICA,

Appellants


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 90-01761)


Argued September 15, 1993

BEFORE: SLOVITER, Chief Judge, and MANSMANN
and GREENBERG, Circuit Judges

Reargued in banc April 26, 1994

BEFORE:  SLOVITER, Chief Judge, and BECKER,
STAPLETON, MANSMANN, GREENBERG, HUTCHINSON,
SCIRICA, COWEN, NYGAARD, ALITO, ROTH,
and LEWIS, Circuit Judges

(Filed:   July 5, l994)

Vicki O'Meara
Acting Assistant Attorney
General
Department of Justice
Environment and Natural
Resources Division
Vicki L. Plaut (argued)
Peter R. Steenland, Jr.
Anne S. Almy
Dirk D. Snel
Ronald M. Spritzer

                              Glen Freyer
                              Attorneys, Department of Justice
                              Environment and Natural
                    Resources Division
                              P.O. Box 23795
                              L'Enfant Plaza Station
                              Washington, D.C. 20026

                                   Attorneys for Appellants

                              Neil G. Epstein (argued)
                              Steven J. Engelmyer
                              Carol L. Press
                              Joyce L. Brong
                              Hangley Connolly Epstein
                              Chicco Foxman & Ewing
                              1515 Market Street
                              Ninth Floor
                              Philadelphia, Pa. 19102

                                   Attorneys for Appellee

OPINION OF THE COURT


GREENBERG, Circuit Judge.


I. FACTUAL AND PROCEDURAL BACKGROUND

The United States and the United States Department of Commerce appeal from a final judgment entered on September 17, 1992, by the United States District Court for the Eastern District of Pennsylvania. The court held the United States jointly and severally liable, as an "owner," "operator" and "arranger," for response costs for which the plaintiff FMC Corporation is or will be responsible under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") to clean up hazardous waste created at an industrial facility during World War II. FMC acquired this facility many

2

years after the war.  The district court entered the final judgment in accordance with its opinion of February 19, 1992, reported as FMC Corp. v. United States Dep't of Commerce, 786 F. Supp. 471 (E.D. Pa. 1992).  FMC brought this action because the Environmental Protection Agency ("EPA") sought to recover the response costs from it.  FMC seeks contribution, claiming that the United States also is liable because the War Production Board ("WPB"), which later was subsumed within the Department of Commerce, owned parts of the facility, operated the facility during World War II, and arranged for the disposal of the wastes created.  FMC and the United States have settled the claim against the United States as an "owner," but the government contends that its conduct other than as an owner was regulatory activity from which the United States is protected from liability by its sovereign immunity.  It further argues that, in any event, it was neither an "operator" nor an "arranger" within CERCLA.  Accordingly, it contends that it cannot be liable other than as an owner.  We reject the government's contentions and thus will affirm.

## A. Statutory Background

Section 104 of CERCLA empowers the government to use money from the "Superfund" to clean up hazardous waste sites.  42 U.S.C. § 9604(a).  Section 107(a)(1)-(4) provides that any "person" who:  (1) is the "owner" or "operator" of a facility where there is a release or threat of release of a hazardous substance, (2) was the "owner" or "operator" of a facility at the

3

time of the disposal of a hazardous substance, (3) "arranged" for such disposal, or (4) "accepted" a hazardous substance for transport to a facility, is liable for the response costs, i.e., the costs of removal and other remedial action incurred by the United States. 42 U.S.C. § 9607(a)(1)-(4). Thus, an entity, such as FMC, which becomes an owner of a facility after the disposal of the hazardous waste is liable under CERCLA. Liability for the costs incurred is strict. United States v. Alcan Aluminum Corp., 964 F.2d 252, 259 (3d Cir. 1992). Section 101(21) defines "person" to include the "United States Government." 42 U.S.C. § 9601(21).

From its inception, CERCLA has included a provision waiving the sovereign immunity of the United States and, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. 99-499, § 120, 100 Stat. 1613, 1666 (1986), CERCLA section 120(a)(1) includes the following waiver provision:

> Each department, agency, and instrumentality of the United States (including the executive, legislative and judicial branches of government) shall be subject to, and comply with this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 [CERCLA section 107] of this title.

42 U.S.C. § 9620(a)(1) (emphasis added).

Persons assessed by the United States with response costs under CERCLA may "seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title [CERCLA section 107(a)], during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f)(1). Therefore, we are concerned on

4

this appeal with the related but nevertheless distinct questions of whether the sovereign immunity of the United States bars this action against it, except as an owner, and whether the United States, if not immune, is liable either as an operator or an arranger, or both.

## B. Factual Background

The facility at issue in this case is located in Front Royal, Virginia, and was owned by American Viscose Corporation from 1937 until 1963, when FMC purchased it. In 1940, American Viscose constructed a plant on the Front Royal site and began manufacturing textile rayon. Before World War II, the machines at the facility were not set up to produce high tenacity rayon. However, after Pearl Harbor, the government determined that the country needed increased production of high tenacity rayon for the manufacturing of war-related products, including airplane and truck tires. Inasmuch as the demand anticipated for high tenacity rayon greatly exceeded the projected supply, the WPB commissioned American Viscose to convert its plant to make high tenacity rayon and American Viscose did so.

Unquestionably, at least by current standards, environmental controls were lax at the facility. Thus, it is not surprising that inspections in 1982 revealed carbon disulfide, a chemical used in manufacturing high tenacity rayon, in the ground water in the vicinity of the plant. Consequently, the EPA began cleanup operations and notified FMC of its potential liability under CERCLA. In 1990, FMC filed this suit against the

5

Department of Commerce under section 113(f) of CERCLA, 42 U.S.C. § 9613(f), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. FMC alleged that, as a result of the government's activities during World War II, the United States was jointly liable with FMC as an "owner" and "operator" of the facility, and as an "arranger for disposal" of hazardous wastes there. In particular, FMC claimed that the government became involved so pervasively in the facility that it effectively operated the plant along with American Viscose and, accordingly, should share in the response costs.

The government filed a motion to dismiss, arguing that the United States could not be shown to have been an operator or an arranger for disposal within the meaning of CERCLA, as its activities affecting the facility were regulatory. The district court rejected the government's position, holding that the United States is liable, regardless of the nature of its activities, whenever the government's "involvement or control become[s] so pervasive or significant as to warrant the imposition of CERCLA liability."

In a subsequent motion for partial summary judgment, the government argued that it had not waived sovereign immunity under CERCLA for purely regulatory activities and that, in any event, its activities at the site did not rise to the level of ownership or operation necessary for the imposition of liability under the statute. The district court denied the motion, holding that there were disputes of material fact relating to the owner and operator issues concerning the extent of the government's

6

activities at the plant.  In March 1991, the district court held a four-day non-jury trial on the liability issues.

Subsequently, in an opinion issued February 20, 1992, the district court held the government liable on all three theories articulated by FMC: as an owner, operator, and arranger. See FMC Corp. v. United States Dep't of Commerce, 786 F. Supp. 471.  The liability period for these categories varied, and no period was identified specifically for "arranger" liability, but all fell between January 1942 and March 1948.

The trial consisted largely of the introduction of documents as most persons with knowledge of the activities at the facility during the war had died.  But the parties also introduced depositions, and there was some in-court testimony.  Based on this evidence, the district court made extensive findings of fact, many if not most of which are not in dispute, and which we only need summarize.

The facility is a 440-acre site and includes a manufacturing plant and 23 waste disposal basins and landfill areas.  The plant was owned and operated by American Viscose from 1940 to 1963, FMC from 1963 to 1976, and Avtex Fibers-Front Royal, Inc. from 1976 to 1989.  American Viscose is now out of business, and Avtex is in bankruptcy reorganization.  Id.

In January 1942, an executive order established the WPB.  The WPB was empowered to issue directives to industry regarding war procurement and production, including directives concerning purchasing, contracting, specifications, construction, requisitioning, plant expansion, conversion, and financing.

Moreover, in 1942, the WPB's powers were expanded to include the seizure and operation of non-complying industries. Id. at 474-75.

At the outset of the war, the United States lost 90% of its crude rubber supply because the Japanese occupied parts of Asia from which this country previously had obtained rubber. Consequently, we turned to synthetic substitutes, like high tenacity rayon, to strengthen and lengthen the life of heavy duty truck and aircraft tires, thus reducing natural rubber consumption. The WPB designated high tenacity rayon as "one of the most critical [products] in the entire production program." Id. at 474-75. The WPB required American Viscose to convert the Front Royal facility to enable it to produce high tenacity rayon, and the facility became one of the few plants in the country manufacturing that product. The WPB's requirement that American Viscose convert the facility and expand its capacity to produce high tenacity rayon diverted the facility's resources from the production of regular textile rayon. Id. at 477.

The government considered facilities producing high tenacity rayon to be "war plants" subject to its maximum control. The director of the WPB's Textile, Clothing and Leather Division, the division directly responsible for high tenacity rayon, regarded the American Viscose facility to a considerable extent to be a government project directly related to the war effort. Inasmuch as the facility was used for a program critical to the success of the war effort, if American Viscose did not comply with the government's production requirements, the government

8

would have seized the facility. Indeed, during the war the government took over numerous plants which failed to meet production requirements, including a plant producing high tenacity rayon owned by American Enka Corporation. Id. at 475-76.

To implement the required plant conversion and expansion, the government through the Defense Plant Corporation ("DPC") leased government-owned equipment and machinery for use at the facility, including 50 spinning machines, an acid spin bath system, piping for the spinning machines and spin bath system, slashing equipment, and waste trucks. But the government did not allow American Viscose to install the leased equipment. Instead, the government contracted with Rust Engineering Company to design and install the DPC-owned equipment at the facility. Under its contract with Rust, the government had substantial control over and participation in the work related to the DPC equipment. For example, all plans, specifications, and drawings were submitted to the DPC for approval; Rust had to obtain prior DPC approval for the purchase of supplies; DPC could promulgate rules governing all operations at the work site and require the removal from work of any Rust employee; and DPC was represented on-site by a government representative, who had the right to direct Rust. The government collected rent from American Viscose on the machinery through 1947, and owned the machinery until March 1948. Id. at 478.

The five principal components of high tenacity rayon, sulfuric acid, carbon bisulfide, wood pulp, chemical cotton

liners, and zinc, were quite scarce during the war. To assure American Viscose an adequate supply of sulfuric acid, the government built and retained ownership of a sulfuric acid plant adjacent to the facility. The plant was connected to the facility through a pipeline, and virtually its entire output was delivered through the pipeline. To satisfy the facility's need for carbon bisulfide, the government commissioned Stauffer Chemical Company to build a plant in the Front Royal area to produce 26.4 million pounds of carbon bisulfide per year. The government required American Viscose to use the raw materials that it obtained from the government or through the use of a government priority rating system for the specific purpose authorized. As a result of the government's involvement in the production of the basic raw materials necessary for manufacturing high tenacity rayon, and its control over the distribution of these raw materials, it determined the operating level of each rayon manufacturer. Id. at 479–80.

In October 1942, the WPB ascertained that the labor force in the Front Royal area would be inadequate to meet future needs at the facility. Consequently, the government obtained draft deferments for personnel at the facility, directed workers in other industries to come to the plant, and provided housing for the additional workers. The government also participated in managing and supervising the workers, by sending personnel to investigate and resolve problems involving worker productivity, to cut down on absenteeism, and to resolve labor disputes. In May 1944, the WPB appointed a full-time representative to reside

10

at Front Royal to address problems at the facility concerning manpower, housing, community services, and other related matters. Moreover, although the government did not hire the employees, it was obligated to reimburse American Viscose for the salaries of certain employees under a lease between the DPC and American Viscose. Id. at 480-81.

After production began, the government placed a representative on-site with the authority to promulgate rules governing all operations at the site and to remove workers who were incompetent or guilty of misconduct. Through continuous informal contacts and communications, the government was involved directly and substantially with the facility's production activities and management decisions. Id. The government controlled the supply and price of American Viscose's raw materials as well as the production level and the price of its product. Therefore, inasmuch as the facility was doing only government mandated work, the government significantly influenced the profit that American Viscose could make at the facility. Id. at 483. Of course, the government was the end-user of almost all of the product manufactured at the facility, either because it purchased the product directly or because the product was sold to other industries for use in war materials.

The government knew that generation of hazardous waste inhered in the production process because its personnel present at the facility witnessed a large amount of highly visible waste disposal activity. Wastes were placed in large unlined basins located on site and, as basins were filled, new ones were dug.

11

Portions of the sulfuric acid utilized in the production process that could not be reclaimed or treated at the facility were deposited in the on-site waste basins, as were carbon bisulfide and zinc contaminated wastes. From 1942 through 1945, at least 65,500 cubic yards of viscose waste were placed in the on-site basins. The disposal basins were visible to any person visiting the facility.

Inasmuch as the generation of waste was inherent in the production of high tenacity rayon, an increase in production automatically increased waste. This fact is significant because governmental pressure to maximize production overtaxed the machinery and equipment at the facility, thereby increasing the amount of material scrapped for disposal in the waste basins. Moreover, the government rejected material not adhering strictly to the production specifications, thereby further increasing the amount of waste. In addition, wastes were generated and disposed of by the government-owned equipment that was installed at the facility. Id. at 483-84.

The district court concluded that the government was an owner and operator of the facility and an arranger of waste disposal. It predicated these conclusions on its factual findings, which can be summarized as follows:

(1) the government required American Viscose to stop making regular rayon and start producing high tenacity rayon;

(2) the government mandated the amount and specifications of the rayon produced and the selling price;

12

(3) the government owned the equipment used to make the high tenacity rayon and owned a plant used to make raw materials;

(4) the government supervised the production process through the enactment of specifications and the placement of on-site supervisors and inspectors; it supervised the workers; and it had the power to fire workers or seize the plant if its orders were not followed; and

(5) the government knew that generation of waste inhered in the production process; it was aware of the methods for disposal of the waste; and it provided the equipment for the waste disposal.

After making its factual findings and conclusions of law, the district court ordered the case to trial to determine the allocation of liability between FMC and the government. However, FMC and the government settled the allocation issues, subject to the government's right to appeal the ruling holding it liable as an operator and arranger. Under the settlement, the government conceded its liability as an owner with respect to its property at the facility and accepted an allocation of 8% of the cleanup costs as owner. But if we uphold the government's liability as an operator and arranger, its total liability under the settlement agreement will be increased to 26% of the cleanup costs. The government asserts that if it is held liable on all three theories, it will be responsible for between $26,000,000 and $78,000,000, a figure which FMC suggests is overstated. On September 17, 1992, in accordance with the parties' agreement and

13

the district court's opinion issued on February 20, 1992, the court entered final judgment.

## II. JURISDICTION AND STANDARD OF REVIEW

The Government filed a timely notice of appeal on November 11, 1992.  We have jurisdiction pursuant 28 U.S.C. §1291.  The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C §§ 9613(b) and 9613(f). We may set aside the district court's findings of fact only if they are clearly erroneous.  Levendos v. Stern Entertainment, Inc., 909 F.2d 747, 749 (3d Cir. 1990).  Our standard of review with respect to alleged error in applying the law to the facts, however, is plenary.  Id.

## III. DISCUSSION

### A. Sovereign Immunity

The government's first argument is that the United States did not waive its sovereign immunity under CERCLA for claims arising from its wartime regulatory activities even though CERCLA section 120(a)(1) provides that "[e]ach department, agency, and instrumentality of the United States . . . shall be subject to, and comply with, this chapter in the same manner and to the same extent . . . as any nongovernmental entity including liability under section" 107 of CERCLA.  42 U.S.C. § 9620(a)(1). This argument starts from the well-settled principle that the federal government is immune from suit "save as it consents to be sued."  United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948,

14

953 (1976).  Furthermore, such consent "cannot be implied but must be unequivocally expressed," id., 96 S.Ct. 953-54, and waivers of sovereign immunity must be construed narrowly in favor of the government.  United States v. Idaho, 113 S.Ct. 1893, 1896 (1993); United States v. Nordic Village Inc., 112 S.Ct. 1011, 1015 (1992).  But see FDIC v. Meyer, 114 S.Ct. 996, 1003 (1994). Accordingly, the government contends that CERCLA's waiver, although express, is not unlimited and that we must construe it narrowly.  Based on a series of cases involving suits brought by the owners of waste sites against the EPA for its activities in taking over these sites for cleaning, the government argues that the CERCLA waiver does not apply to federal regulatory actions that a non-governmental entity cannot undertake.  Thus, it argues that because most of the WPB's activities impacting on the facility were regulatory we must discount them in our analysis of the government's possible liability.  In its view, its remaining non-regulatory activities did not involve the government sufficiently with American Viscose to justify the imposition of CERCLA liability on the government.

In re Paoli R. Yard PCB Litig., 790 F. Supp. 94, 95-96 (E.D. Pa.), aff'd, 980 F.2d 724 (3d Cir. 1992) (table), is an example of the type of case on which the government relies. There, the EPA took over a hazardous waste site in order to clean it up.  In so doing, the EPA allegedly caused the further release of hazardous waste.  Based on this release, the site's owner sued the EPA for contribution and indemnification for response costs. The owner argued that the EPA became an operator under CERCLA

15

when it conducted the cleanup activities at the site.  The district court dismissed the complaint, holding that the United States does not subject itself to liability as an operator when it is engaged in cleanup activities at a hazardous waste site. Rather, the United States "would be liable under section 107(a) of CERCLA if it was acting in a manner other than in its regulatory capacity."  790 F. Supp. at 97.

Similarly, in another case where an owner alleged that the EPA became an "owner" or "operator" by taking over a waste site to initiate a cleanup, a district court held that the waiver of sovereign immunity under CERCLA is limited.  United States v. Atlas Minerals and Chems., Inc., 797 F. Supp. 411, 420 (E.D. Pa. 1992).  "[T]he waiver contained in [CERCLA section 120(a)(1)] only applies to situations in which the government has acted as a business," and "does not extend to situations in which the EPA has undertaken response or remedial actions at a hazardous waste site."  The court reached this conclusion because:

> when the EPA undertakes such actions, it is
> not acting like a private party; it is acting
> to ameliorate a dangerous situation that, but
> for the prior actions of the generators and
> transporters of the hazardous waste, would
> not exist.

797 F. Supp. at 421.  See also Reading Co. v. City of Philadelphia, 155 B.R. 890, 897 (E.D. Pa. 1993) (indicating that the "government, unlike private parties, has a regulatory and response duty to assume a clean-up role.  Therefore, inasmuch as a government, unlike private entities, must act to remedy

16

environmental crises, a government cannot, in such circumstances, be considered an owner, operator or arranger for CERCLA purposes").

The government contends that these cases establish a per se rule that regulatory activities cannot constitute the basis for CERCLA liability, because only a government can regulate. However, we think the distinction the government is trying to draw between regulatory and non-regulatory activities misreads CERCLA and the case law. In the first place, section 120(a)(1) does not state that regulatory activities cannot form the basis of liability. Rather, it states that the government is liable in the same manner and to the same extent as any non-governmental entity. Thus, when the government engages in activities that would make a private party liable if the private party engaged in those types of activities, then the government is also liable. This is true even if no private party could in fact engage in those specific activities. For example, although no private party could own a military base, the government is liable for clean up of hazardous wastes at military bases because a private party would be liable if it did own a military base. Cf. United States v. Allied Corp., 1990 U.S. Dist. Lexis 20061, at *7-9 (N.D. Cal. Apr. 26, 1990) (United States Navy found liable under CERCLA because it authorized demolition which caused release of hazardous substances). Just as the government can be liable for hazardous wastes created at a military base it owns, the government can be liable when it engages in regulatory activities extensive enough to make it an operator of a facility

17

or an arranger of the disposal of hazardous wastes even though no private party could engage in the regulatory activities at issue.

Our conclusion is consistent with our approach to statutory construction in general, and to CERCLA in particular, which is to read plain language to mean what it says. Alcan Aluminum, 964 F.2d at 260. This conclusion is bolstered by Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122 (1955), in which the Supreme Court interpreted the provision of the Federal Tort Claims Act stating that, "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. §2674, to waive sovereign immunity even with respect to activities which private persons do not perform. The Court stated that, "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government." Id. at 67, 76 S.Ct. at 126. We find Indian Towing controlling.

Moreover, we disagree with the dissent's characterization of the "activity at issue" in this case. Typescript at 3. The dissent describes "the activity at issue here" as "mobilizing the private economy in the war effort," and concludes that the government cannot be held liable for this activity because "no private party can replicate [it]." Id. In our opinion, the mobilization of the private economy was the purpose of the government's activity at the Front Royal site and the war provided the authority for its activities. However, we would characterize the "activity at issue here" as the day-to-day

18

actions taken by the government with relation to the Front Royal site and adjudicate the case from that perspective.

Our reading of section 120(a)(1) comports with the rest of CERCLA. First of all, the government's contention is inconsistent with our previous recognition that "CERCLA is a remedial statute which should be construed liberally to effectuate its goals." Alcan Aluminum, 964 F.2d at 258. In practice, the "regulatory" exception suggested by the government would be inconsistent "with CERCLA's broad remedial purposes, most importantly its essential purpose of making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1221 (3d Cir. 1993) (internal quotation marks omitted). See also United States v. Azrael, 765 F. Supp. 1239, 1245 (D. Md. 1991) (party benefiting from commercial activity should internalize health and environmental costs of the activity into costs of doing business). By placing the burden of cleanups on responsible parties, CERCLA was intended to "serve[] as an incentive for the sound treatment and handling of hazardous substances." 125 Cong. Rec. 17989 (1979) (statement of Senator John C. Culver of Iowa), reprinted in, 1 Senate Committee on Environment and Public Works, A Legislative History of CERCLA, Pub. Law 96-510 at 148-49 (Comm. Print 1983). Accordingly, if the United States, even as a regulator, operates a hazardous waste facility or arranges for the treatment or disposal of hazardous wastes, it should be held

19

responsible for cleanup costs, just as any private business would be, so that it will "'internalize' the full costs . . . [that hazardous] substances impose on society and on the environment." United States v. Atlas Minerals and Chems., Inc., 797 F. Supp. at 413 n.1.

Second, our reading comports with the rest of CERCLA because section 107(b), 42 U.S.C. § 9607(b), lists the only three defenses to section 107 liability available to any person, including the government. See Alcan Aluminum, 964 F.2d at 265. These enumerated defenses do not include the "regulatory" exception which the government seeks to create and on which it relies. Of course, in view of the plain waiver of sovereign immunity in section 120, which places the government in the same position as a nongovernmental entity, we cannot hold that a regulatory defense provision is not required to uphold the government's position on a theory that regulatory activity can never form the basis for liability under CERCLA. We also point out that our approach is consistent with United States v. Rohm and Haas Co., 2 F.3d 1265, 1276 (3d Cir. 1993), in which we refused to read the term "removal" in CERCLA section 101(23) to include governmental oversight of private remedial actions, in part because we found "it highly significant that Congress omitted any mention of oversight . . . in the definition of removal."  Just as we would not read undesignated conduct into the definition of "removal," we will not read the broad regulatory exception advanced by the government into section 107(b) or section 120(a)(1).

20

Section 107(d)(2) provides further evidence that our reading of section 120(a)(1) comports with the rest of CERCLA. Although CERCLA permits the imposition of liability on states and local governments for cleanup costs, section 107(d)(2) expressly immunizes them from liability for actions "taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person." 42 U.S.C. § 9607(d)(2). Congress's creation of an exception for cleanup activities by state and local governments plainly shows that it intended to treat these activities differently from other government activities. Accordingly, CERCLA does not protect a government from liability simply because it acts in a regulatory capacity. Rather, a government is protected under section 107(d)(2) because it is responding to an environmental emergency.

We do not mean to suggest that the cases relied on by the government which we have cited were decided wrongly. All of those cases involved governmental regulatory activities undertaken solely with the purpose of cleaning up hazardous materials -- activities undertaken "to ameliorate a dangerous situation that, but for the prior action of the generators and transporters of the hazardous waste, would not exist." See United States v. Atlas Minerals and Chems., Inc., 797 F. Supp. at 421. We do not think that CERCLA's "essential purpose of making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created," Lansford-Coaldale, 4 F.3d at

21

1221 (internal quotation marks omitted), is served by making the government liable for attempting to clean up wastes created by others. CERCLA does not intend to discourage the government from making cleanup efforts by making the government liable for such efforts.

We believe that Congress intended to treat the federal government in the same manner as state and local governments. Thus, it stands to reason that inasmuch as state and local governments are immune from CERCLA liability for the consequences of cleanup activities in response to emergencies created by others, but not for the consequences of regulatory conduct in general, we should read this distinction as implied in the federal government's waiver of sovereign immunity as well.[0]

Because the government's involvement with the American Viscose plant was not in response to a threatened release of hazardous materials, we hold that the relevant sovereign immunity question under CERCLA is not whether the government was acting in a regulatory capacity, but whether its activities, however characterized, are sufficient to impose liability on the government as an owner, operator, or arranger. Hence, we consider both the government's regulatory and non-regulatory activities with respect to the facility during the war and determine whether these activities taken in _toto_ were of the type

---

[0]Judge Alito does not join the preceding two paragraphs of this opinion. He does not believe that the question whether the government may be liable for cleanup activities is before the court in this case, and therefore he does not think that the court should opine upon it.

commonly associated with being an operator or arranger under CERCLA and are the type of activities in which private parties could engage. We need not consider the "owner" question as the parties have settled that issue. Thus, the liability issue is simply whether the government is liable as an operator or arranger. See FDIC v. Meyer, 114 S.Ct. at 1004.

In reaching our result, we recognize that section 120(a)(1) which waives sovereign immunity is a portion of a section entitled "Federal facilities," thus permitting an argument to be made that Congress only intended to impose liability on the United States under CERCLA for federally owned facilities. That argument, however, is unavailing for three reasons.

First, of course, the language of section 120(a)(1) does not limit government liability to federally owned facilities. Rather, section 120(a)(1) deals with the application of CERCLA to the "Federal Government" "[i]n general," and it imposes liability on the government to the same extent as liability is imposed on "any nongovernmental entity." Second, even though Congress added section 120 dealing with "Federal facilities" to CERCLA in 1986, see Pub. L. No. 99-499, Title I, §120, 100 Stat. 1666, Congress waived sovereign immunity in the original version of CERCLA in 1980 in language not materially different from the amended language in 1986. Thus, Pub. L. No. 96-510, Title I, § 107(g), 94 Stat. 2783, an original CERCLA provision, provided that "[e]ach department, agency, or instrumentality of the executive, legislative, and judicial

23

branches of the Federal Government shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under this section." This waiver provision was not linked to the federal facilities section, as that section did not exist in 1980.

Third, in 1986, when Congress moved the sovereign immunity waiver provision from section 107 to section 120, it provided that the governmental entities would be subject to "liability under section" 107. This reference was an exact counterpart to language in section 107 as originally enacted, as that provision provided that the governmental entities would be subject to "liability under this section." Thus, Congress did not expressly limit the scope of the waiver.

Inasmuch as Congress did nothing in terms in 1986 to narrow its earlier waiver of sovereign immunity, it would be unreasonable for us to infer that it impliedly limited its original waiver by moving the waiver section. Indeed, if anything, through its enactment of section 120, Congress reemphasized its intention that CERCLA be applied to the government. Overall, we think it is quite clear that the transfer of the waiver of sovereign immunity provision was nothing more than a logical reordering of the waiver provision accompanying the enactment of section 120.[0] Accordingly, we now

_____

[0] We also point out that it would be difficult to understand why Congress would have limited the waiver of sovereign immunity to activities at federally owned facilities. In this regard, we only need point to Alcan Aluminum and then consider whether

pass to the questions of whether the United States is liable as an operator and arranger.

## B. Operator Liability

The definition of "operator" in CERCLA gives little guidance to the courts in determining if a particular person or entity is liable as an operator because the statute circularly defines "operator" as "any person . . . operating such facility." 42 U.S.C. § 9601(20)(A)(ii). Fortunately, however, the case law provides us with criteria for identifying those who qualify as "operators" under CERCLA.

We start our discussion of whether the government was an operator by considering our opinion in Lansford–Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209. In that case, we adopted the "actual control" test in determining whether operator liability should be imposed on one corporation for the acts of a related corporation. The actual control test imposes liability which would not be consistent with "traditional rules of limited liability for corporations" but nevertheless is consistent "with

---

Congress intended that a private corporation but not the government could be liable for response costs caused by the deposit of liquid wastes generated at its facility into the Borehole and subsequently released into the river. 964 F.2d at 255–56. Moreover, the discussion of the facts underlying Key Tronic Corp. v. United States, 62 U.S.L.W. 4441, 4442 (U.S. June 6, 1994), indicates that the United States Air Force agreed to settle a suit brought against it by the EPA under CERCLA charging that it was liable for response costs as one of multiple parties that used a site for the disposal of liquid chemicals which later contaminated the water in the surrounding area. According to Key Tronic Corp., the Air Force agreed to pay the EPA $1.45 million. Thus, the government itself does not treat the waiver of sovereign immunity as being limited to federal facilities.

25

CERCLA's broad remedial purposes, most importantly its essential purpose of making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." Id. at 1221 (internal quotation marks omitted). Under this test, a corporation will be liable for the environmental violations of another corporation if there is evidence that it exercised "substantial control" over the other corporation. Id. At a minimum, substantial control requires "active involvement in the activities" of the other corporation. Id. at 1222. While Lansford-Coaldale arose in the context of related corporations, it is nevertheless instructive here.

In our view, it is clear that the government had "substantial control" over the facility and had "active involvement in the activities" there. The government determined what product the facility would manufacture, controlled the supply and price of the facility's raw materials, in part by building or causing plants to be built near the facility for their production, supplied equipment for use in the manufacturing process, acted to ensure that the facility retained an adequate labor force, participated in the management and supervision of the labor force, had the authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product. While the government challenges some of the district court's findings, it simply cannot quarrel reasonably with the court's conclusions regarding the basic situation at the

26

facility.  In particular, the government reasonably cannot quarrel with the conclusion that the leading indicia of control were present, as the government determined what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold.

In these circumstances, we must conclude that the government was an operator of the facility unless we overrule or narrowly limit the unanimous panel decision in Lansford-Coaldale, a step we will not take.  Instead, we look to other cases which construe "operator" insofar as they inform the overarching Lansford-Coaldale test of actual and substantial control over "the corporation's day-to-day operations and its policy making decisions."  Lansford-Coaldale, 4 F.3d at 1222.  The government's argument is no stronger, for under section 120 it is in the same position "as any nongovernmental entity" with respect to CERCLA liability.  None of these factors is dispositive, and each is important only to the extent it is evidence of substantial, actual control.

For example, in United States v. New Castle County, 727 F. Supp. 854, 869 (D. Del. 1989), the district court listed the following factors as being relevant: whether the person or entity controlled the finances of the facility; managed the employees of the facility; managed the daily business operations of the facility; was responsible for the maintenance of environmental control at the facility; and conferred or received any commercial or economic benefit from the facility, other than the payment or receipt of taxes.  Another court in deciding whether a parent

27

could be liable as an operator along with the subsidiary, stated that courts should consider: whether the parent has the power to direct the activities of persons who control mechanisms causing the pollution; whether and to what extent the parent controls the subsidiary's marketing; whether the parent can execute contracts on behalf of the subsidiary; and whether the parent controls hiring, supervision, transfer and similar aspects of employment at the subsidiary. Colorado v. Idarado Mining Co., 1987 U.S. Dist. LEXIS 14254, 18 Envtl. L. Rep. 20,578 (D. Colo. Apr. 29, 1987).[0]

Courts have applied the Lansford-Coaldale standard and factors such as those considered in New Castle County and Idarado Mining in considering a state or local government's liability as an operator under CERCLA. For example, in United States v. Stringfellow, supra, a special master concluded that California was liable under CERCLA as an operator and owner of a landfill. The special master noted that the state chose the location for the landfill, designed and constructed the site, hired, directed and supervised the employees with day-to-day operational responsibility for the site, and set the responsibilities for these employees.

---

[0]On an appeal from a mandatory injunction issued on February 22, 1989, ordering the state's cleanup plan implemented, the parent challenged the earlier finding of the district court that it was an operator. However, the court of appeals decided the case without reaching this issue. Colorado v. Idarado Mining Co., 916 F.2d 1486, 1491 (10th Cir. 1990), cert. denied, 111 S.Ct. 1584 (1991).

In contrast, the Court of Appeals for the Fourth Circuit affirmed a district court finding that the South Carolina Department of Health and Environmental Control ("DHEC") was not an owner or operator of the abandoned Fort Lawn waste site. United States v. Dart Indus., Inc., 847 F.2d 144 (4th Cir. 1988). In Dart, the generators of the hazardous wastes alleged, in their third-party complaint, that DHEC was liable under CERCLA because it controlled the activities at the site pursuant to a South Carolina statute that gave it regulatory powers such as the power to approve and disapprove applications to store wastes at the site, to inspect the site, and to regulate the transportation of the wastes delivered to Fort Lawn. The court of appeals found that DHEC did not have operator status because there was no evidence that it directly managed the waste site's employees or finances or ran the day-to-day activities of the facility. Thus, DHEC did not engage in "hands on" activities contributing to the release of hazardous wastes. Similarly, in New Castle County, 727 F. Supp. 854, the district court declined to find the state liable as an operator of a landfill where it only periodically inspected the site and mandated the details of refuse soil compaction and construction, but did not manage the day-to-day operations of the landfill. But Dart and New Castle County are distinguishable because in neither case did the governmental entity implicated have the control that the federal government exercised at Front Royal, and in neither case was the governmental entity involved in the facility for the purpose of obtaining a product for its own use.

29

The government exerted considerable day-to-day control over American Viscose, and at the risk of being repetitious, we will explain why. In the first place, American Viscose would not have been making high tenacity rayon if not at the government's direction. To obtain the commercial product it needed, the government diverted American Viscose from its previous commercial endeavors. Thus, every day American Viscose did what the government ordered it to do. Second, although the government officials and employees personally did not take over the plant, the government maintained a significant degree of control over the production process through regulations, on-site inspectors, and the possibility of seizure. Third, the government built or had built plants supplying raw materials to American Viscose, controlled these plants, arranged for an increased labor force, and supervised employee conduct, at least to the extent of helping American Viscose deal with labor disputes and worker absenteeism. Fourth, the government supplied machinery and equipment for use in the manufacturing process. Fifth, the government controlled product marketing and price. Given this degree of control, and given the fact that the wastes would not have been created if not for the government's activities, the government is liable as an operator. Indeed, on the record before us, if we rejected the district court's conclusion that the government was an operator, we would create a precedent completely out of harmony with the case law on what makes a person an operator under CERCLA.

30

We are well aware that the government seeks to minimize the scope of its involvement in American Viscose's activities by arguing that its involvement revolved around the government-owned equipment and machinery at the facility. While we do not doubt that the government was concerned with that machinery and equipment, it was involved with the facility's operations as a whole. In order to demonstrate the government's overall participation in the operation of the facility, we shall make reference to representative evidence in the record.

We consider the minutes of a meeting held on March 7, 1944, attended by ten representatives of the WPB, three from American Viscose, and one from Rust Engineering. See app. at 1716. O.T. Rhodes, a consultant to the Tire Cord Branch of the WPB, opened the meeting by indicating that its "stated purpose" was "to iron out Housing, Transportation, and Manpower Problems at Front Royal, Virginia, area." During the course of the meeting, American Viscose's Front Royal manager discussed labor and transportation problems with the WPB representatives who were concerned with their alleviation. At one point, when American Viscose identified problems resulting from the draft, a WPB representative noted that "Front Royal will notify us here in case they get into a jam on any individual." App. at 1720. He then indicated that "It was agreed on unanimously that a WPB Priorities man was needed on the Housing situation." Id. The government's concerns at this meeting simply cannot reasonably be regarded as being confined to a concern over its equipment and

machinery or be characterized as that of an ordinary purchaser of a product from a manufacturer.

A letter between high-level government officials on March 14, 1944, demonstrates the real situation at the facility. On that day Donald M. Nelson, Chairman of the WPB, wrote to Paul V. McNutt, Chairman of the War Manpower Commission, as follows:

> As you know the War Production Board considers the production of tire type high-tenacity rayon one of the most critical in the entire production program. It calls for an expansion from an annual rate of 66 million pounds in August, 1943 to 240 million pounds for the year 1944. One-third of the expansion will be accounted for by the new facilities projected by the American Viscose Corporation at Front Royal, Virginia.
>
> It has been reported to me that the preparations for manning the Front Royal plant have been, in the judgment of the local management and other responsible people, inadequate to meet the production requirements. I would like to request that you assign immediately representatives of your staff to go into this question with men who are responsible for this production in the War Production Board. I am asking Mr. Golden's staff to act as the clearance point in this matter. App. at 1746.

As the foregoing documents make plain, it simply is not accurate to say that the government's activities at the facility were limited to government-owned equipment and machinery, when the government's overriding concern was the efficient operation of the facility as a whole. The government's interest in the facility's operation was, of course, understandable because in the parlance of the 1940's used to explain the many dislocations of the times, "There's a war on." It was altogether natural and

appropriate for government representatives to participate in decisions concerning the production of a product which WPB chairman Nelson characterized as "one of the most critical in the entire production program." Overall, unless we adopt a revisionist view of history, when we consider "the totality of the circumstances presented" we cannot reject the district court's "inherently fact-intensive" conclusion that the government was an operator of the facility. See Lansford–Coaldale, 4 F.3d at 1222.

## C. Arranger Liability

The government also argues that it is not liable under section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as an arranger for the disposal or treatment of hazardous wastes. The court is equally divided on this point and consequently we will affirm the judgment of the district court holding the government liable as an arranger without discussion.

## IV. CONCLUSION

We conclude with one final point. In its brief, the government urges that its potential liability under the district court's opinion "is massive and far outpaces anything Congress could have imagined, much less intended" when it adopted section 120(a). Indeed, it contends that in this case alone it will be responsible for between $26,000,000 and $78,000,000, if we affirm the district court, and it goes so far as to list other pending cases which it indicates "involve the same or similar issues to

33

those presented in this appeal."  While it may be true that application of the principles in this case by other courts could lead to the imposition of broad liability on the government,[0] that circumstance cannot influence our result as we cannot amend CERCLA by judicial fiat.  Rather, our approach must be the same as that of the Supreme Court when responding to an argument that the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., was being applied too broadly:  "this defect – if defect it is – is inherent in the statute as written, and its correction must lie with Congress."  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S.Ct. 3275, 3286–87 (1985). Furthermore, we point out that at bottom our result simply places a cost of the war on the United States, and thus on society as a whole, a result which is neither untoward nor inconsistent with the policy underlying CERCLA.

We will affirm the judgment of the district court of September 17, 1992.

---

[0] Of course, this outcome is by no means a certainty, as the degree of governmental involvement at other facilities may not have equaled that at Front Royal.  As we emphasized in Lansford–Coaldale, 4 F.3d at 1222, the "determination whether a corporation has exerted sufficient control to warrant imposition of operator liability requires an inherently fact–intensive inquiry."  Thus, our opinion obviously cannot be applied in other situations involving wartime production without an analysis of the facts in those cases.

<u>FMC Corp. v. United States Department of Commerce.</u>, No. 92-1945


SLOVITER, Chief Judge, <u>dissenting</u> with whom Judges Cowen and Roth join, and with wh

Judge Stapleton joins as to Part II.

I respectfully dissent from the majority's holding that the intense activ

undertaken by the United States during World War II in coordinating and steering th

country's private industries to insure that they would produce the war supplies nec

to mount the country's military operations subjects the United States to liability

"operator" and "arranger" under the Comprehensive Environmental Response, Compensat

and Liability Act (CERCLA). I believe that Congress did not waive the sovereign im

of the United States for this unique governmental activity. The broad imposition o

liability that the majority opinion places on the government is unique in the histo

CERCLA and will have consequences far beyond any manifested intent of Congress. In

event, the quantum and nature of the government's activities set forth on this reco

not rise to the statutory "operator" and "arranger" level.

I.

It is of course well established that the government waives only so much

sovereign immunity as it has chosen to waive in clear and express language. <u>See Un</u>

<u>States v. Testan</u>, 424 U.S. 392, 399 (1976). That CERCLA contains a waiver of some

government's sovereign immunity is undisputed. <u>See Pennsylvania v. Union Gas Co.</u>, 4

1, 10 (1989).

The relevant provision, located significantly in the section entitled "Fe

facilities," states:
> Each department, agency, and instrumentality of the United States
> (including the executive, legislative, and judicial branches of
> government) shall be subject to, and comply with, this chapter in the
> <u>same manner and to the same extent</u>, both procedurally and
> substantively, <u>as any nongovernmental entity</u>, including liability
> under section 9607 of this title.

36

CERCLA § 120(a)(1), 42 U.S.C. § 9620(a)(1) (1988) (emphasis added).  However, the

existence of a waiver is only the beginning of the analysis.  What is at issue here

scope of the waiver, limited as it is to the extent of liability of a private party

The government proffers a construction of CERCLA's waiver of sovereign im

that subjects it to liability when it is acting or has acted like a "nongovernmenta

entity," such as by owning facilities, but not when it is conducting a sovereign's

regulatory actions in connection with the operations of a private, for-profit entit

Thus, under the government's analysis, its operation of facilities such as a federa

or an army base or naval vessel would subject it to "operator" or "owner" liability

CERCLA but its regulation of private parks or other private facilities would not, e

that regulation may result in the discharge of hazardous waste. I find the governme

construction of the statute      reasonable insofar as it would cover government ow

or operation of facilities, as opposed to government regulation of private faciliti

The majority construes the waiver to provide that "when the government en

in activities that would make a private party liable . . . then the government is a

liable . . . even if no private party could in fact engage in those activities." Ma

Typescript Op. at 17-18 (emphasis omitted).  That construction of the statute is

illogical, not much different than saying that birds are required to have passports

across the borders of nations that require people to have passports. The fact is th

there are some activities inherent in the role of government which no private party

replicate, and mobilizing the private economy in the war effort, the activity at is

here, is one of them.[0]

---

[0]While the Supreme Court has not yet addressed the issue, see Berkovitz v. United S
486 U.S. 531, 535 n.2 (1988); United States v. S.A. Empresa de Viacao Aerea Rio Gra
(Varig Airlines), 467 U.S. 797, 815 n.12 (1984), courts have generally held that th
similar waiver of sovereign immunity in the Federal Tort Claims Act does not extend
exercise of regulatory power because there are no private analogs to the government
regulatory power over its citizens.  See, e.g., Meyers v. United States, 17 F.3d 89

Admittedly there are some government activities that may fairly be includ[ed]
within the rubric of regulation that can be performed by private parties, and the
operation of a lighthouse, prominently emphasized by the majority, is one of these.
Indian Towing Co. v. United States, 350 U.S. 61, 69 (1955).  In contrast, there are
regulatory activities reserved exclusively to the federal government, such as winni[ng]
war, and it is these types of activities to which the waiver of sovereign immunity [set]
forth in section 120(a)(1) of CERCLA does not extend.  See The Federalist No. 41, a[t]
(James Madison) (Jacob E. Cooke ed., 1961) ("Security against foreign danger is one [of the]
primitive objects of civil society.  It is an avowed and essential object of the Am[erican]
Union.  The powers requisite for attaining it, must be effectively confided to the [federal]
councils."); cf. Feres v. United States, 340 U.S. 135, 141-42 (1950) (government no[t]
liable under Federal Tort Claims Act for injuries to members of the armed forces in[cident]
to service, in part because "no private individual has power to conscript or mobili[ze a]
private army with such authorities over persons as the Government vests in echelons [of]
command"); In re Air Crash Disaster at Mannheim, 769 F.2d 115, 121 (3d Cir. 1985)
("Although judges must decide cases arising from fields of endeavor of which they k[now]

(6th Cir. 1994) (sovereign immunity not waived for suit alleging negligent mine ins[pection]
because enforcing safety regulations is a "situation[] in which only governments ca[n find]
themselves and, therefore, ordinary state-law principles of private liability do no[t, indeed]
cannot, apply"); Akutowicz v. United States, 859 F.2d 1122, 1126 (2d Cir. 1988) (so[vereign]
immunity not waived for suit challenging decertification of person's national citiz[enship]
because "the withdrawal of a person's citizenship constitutes a quasi-adjudicative [act]
for which no private analog exists"); C.P. Chem. Co. v. United States, 810 F.2d 34, [(2d]
Cir. 1987) (sovereign immunity not waived for suit alleging improper promulgation o[f an]
administrative regulation because "the United States cannot be held liable, for no [private]
analog exists"); Jayvee Brand, Inc. v. United States, 721 F.2d 385, 390 (D.C. Cir. [1983)]
(separate opinion of Bork, J.) (sovereign immunity not waived for suit seeking dama[ges for]
ultra vires regulation because "quasi-legislative or quasi-adjudicative action by a[n]
agency of the federal government is action of the type that private persons could n[ot]
engage in"); McMann v. Northern Pueblos Enterprises, 594 F.2d 784, 785-86 (10th Cir[. 1979)]
("As the Miller Act deals exclusively with federal contracts, private persons would [never]
be in a position to require the posting of a Miller Act bond by a contractor.  It f[ollows]
that private persons could not possibly be liable for any negligent failure to insi[st on]
the posting of such a bond.  Since a private person could not be liable for such fa[ilure,]
the United States could not be under the provisions of the Federal Torts Claims Act[").

38

little, their otherwise omnicompetence confronts its limits in military matters.  A

point, it must be acknowledged, separation of powers becomes a proper concern."), __

denied__, 474 U.S. 1082 (1986) (quotation omitted).

Even the majority, as sweeping as its opinion is, recognizes that it is n

to eliminate all distinctions between the liability of the federal government and t

a private party.  Instead, the majority finds an "implied" exception to its view of

unlimited waiver for those instances when the federal government acts "solely with

purpose of cleaning up hazardous materials," believing that such an exception furth

"essential purpose" of CERCLA.  Majority Typescript Op. at 22-23.[0]  I believe, howe

that by limiting its implied exceptions solely to those that further CERCLA's purpo

majority ignores the important obligations the federal government has outside the

environmental arena.

---

[0]The majority relies on Congress's inclusion of an express statutory exemption for
activities by state and local governments and then states that it "believe[s] that
Congress intended to treat the federal government in the same manner as state and l
governments."  Majority Typescript Op. at 22.  It cites no support for this asserti
it would seem to be a difficult proposition to sustain, particularly in light of th
majority's insistence that any exception for activities of the federal government b
explicit.  Congress has treated federal and state governments differently throughou
statute's existence. While the federal government's sovereign immunity was waived i
to some extent, see Pub. L. No. 96-510, Title I, § 107(g), 94 Stat. 2767, 2783 (198
states' Eleventh Amendment immunity was not abrogated until six years later, see Pu
No. 99-499, Title I, § 101(b)(1), 100 Stat. 1614, 1615 (1986) (codified at CERCLA §
101(20)(D), 42 U.S.C. § 9601(20)(D) (1988)), and then only with explicit provisions
protect state and local governments (but not the federal government) from liability
arising out of "actions taken in response to an emergency created by the release . .
a hazardous substance generated by or from a facility owned by another person."  Se
107(d)(2), 100 Stat. at 1629 (codified at CERCLA §107(d)(2), 42 U.S.C. § 9607(d)(2)
(1988)).

Furthermore, the majority's implication of an exception for federal clean
hazardous materials from the waiver of sovereign immunity makes the statute's expli
exception for cleanup by state governments in section 107(d)(2) redundant because s
101(20)(D) abrogates the states' sovereign, i.e. Eleventh Amendment, immunity in la
virtually identical to its waiver of the federal government's sovereign immunity.

For example, in discussing the government's attempt to regulate the domes

economy to increase production during World War II, the Supreme Court has noted tha

government had "a primary obligation to bring about whatever production of war equi

and supplies shall be necessary to win a war." Lichter v. United States, 334 U.S.

765-66 (1948) (emphasis added). There is a coincidental irony that the majority's

comes shortly after the 50th Anniversary of D-Day, when the attention of the nation

the media were focused on the crucial role in winning the war played by American in

See, e.g., ABC World News Tonight: Look Back at Preparations for D-Day Invasion, (A

television broadcast May 31, 1994) ("America's vast production might was mobilized

defeat Hitler.  The U.S. war industries performed miracles."); ABC World News Tonig

Homefront Workers Made World War II Victory Possible, (ABC television broadcast Jur

1994) (Hitler "lost the battle of production.  Before he lost anything else, he los

battle of production.").

Only the federal government – and exclusively the federal government – ha

power and the ability to organize the myriad details needed to accomplish this over

goal. Yet it is precisely this organization – the allocation of essential resources

specification of production quotas, the arrangement of manpower, and the control of

to prevent runaway inflation – on which the majority bases its imposition of liabil

Certainly no private party could have engaged in such activity, and the majority of

not one shred of evidence that when Congress limited its waiver of sovereign immuni

actions for which a nongovernmental entity would be liable, it intended to waive li

for these unique activities.

Instead, it is when the government undertakes to respond to society's pro

through operation of its own facilities (as distinguished from regulating the condu

others), for example a government hospital, prison or military base, that its activ

are analogous to those of private parties, and it is consequently subject to "opera

liability under CERCLA.  This reading of the sovereign immunity waiver has its root

40

statute itself.  The placement and title of the sovereign immunity waiver in secti

entitled "Federal facilities" lends support to the government's proposition that th

provision was intended only to ensure CERCLA liability for

hazardous waste generated at federally-owned or federally- operated facilities.  Se

S. Katzman, Note, The Waste of War: Government CERCLA Liability at World War II

Facilities, 79 Va. L. Rev. 1191, 1206-07 (1993).[0]

Although the majority responds that virtually identical language appeared

waiver of sovereign immunity in the original 1980 statute, and therefore placement

provision in 1986 under the title "Federal facilities" has no significance, the maj

fails to consider the likelihood that the new placement was intended to clarify the

of the waiver.  In fact, remarks by Senators contemporaneous to the legislation tha

placed the waiver under the "Federal facilities" designation suggest that this was

Congress's view of the scope of the waiver, and the majority points to nothing to t

contrary in the legislative record.  See 132 Cong. Rec. 28,413 (1986) (statement of

Stafford) (suggesting that section 120 exists to deal with "two to three potential

hazardous sites at each of 473 military bases across the country" and "sites operat

the Department of Energy"); 131 Cong. Rec. 24,733 (1985) (statement of Sen. Wilson)

Federal facilities, we are talking primarily of military bases, although the Depart

Energy has a few sites . . . and the Department of the Interior has some hazardous

cleanup responsibilities as well.").[0]

---

[0]The majority errs in suggesting that my reading of the waiver would preclude holdi
government liable in cases like Key Tronic Corp. v. United States, 62 U.S.L.W. 4441
June 6, 1994), where the Air Force agreed to pay the EPA for a portion of a cleanup
local landfill in which it had deposited liquid chemicals.  Majority Typescript Op.
n.2.  Nothing in my construction of the statute precludes liability of the governme
operating its own facility or arranging for the disposal of its own hazardous waste
position that purely regulatory activities are not encompassed in the government's
liability would not have shielded it in Key Tronic, where, as distinguished from it
regulation in this case, the Air Force disposed of waste it had generated at a land
just as private entities do every day.
[0]Neither of the statutory provisions relied upon by the majority supports its posit
that the CERCLA sovereign immunity waiver encompasses the government's regulatory

41

Reading the waiver in this manner does not nullify it. Studies suggest th

there are numerous government facilities dangerous enough to fall within the ambit

CERCLA, see Stan Millan, Federal Facilities and Environmental Compliance:  Toward a

Solution, 36 Loy. L. Rev. 319, 321-24 (1990) (discussing scope of problem); 57 Fed.

31,758 (July 17, 1992) (list of 1,709 federal facilities for potential inclusion or

National Priorities List), and Congress was certainly aware of this, see, e.g., H.

No. 253(I), 99th Cong., 2d Sess. 58 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 28

also Review of Hazardous Waste Disposal Practices at Federal Facilities:  Hearing H

Subcomm. of the House Comm. on Government Operations, 98th Cong., 1st Sess. 1-3, 17

215-17 (1983).

In our recent opinion in United States v. Rohm and Haas Co., 2 F.3d 1265,

(3d Cir. 1993), we held that the government could not recover from private parties

cost of government oversight of the removal and remedial activity performed and pai

by a private party.  We recognized the incomparability between government and priva

action, and were unwilling to read CERCLA as treating government cleanups and priva

cleanups as equivalent actions for purposes of recovery of costs.  See id. at 1277-

noted that it was "far more likely that Congress viewed EPA's overseeing of a priva

party's removal activities as qualitatively different from EPA's actually performin

removal activities."  Id. at 1277 (emphasis added).

activities at issue here.  There is no reason why section 107(b), which lists three
defenses such as act of God and act of war to section 107 liability, would also hav
specified a regulatory defense, as the majority argues, inasmuch as Congress had el
limited the government's liability to activity analogous to that of nongovernmental
entities, i.e. in section 120(a).

The other statutory provision referred to by the majority, section 107(d)
and previously discussed at note 2 supra, immunizes state and local governments fro
liability for certain cleanup activities of "a hazardous substance generated by or
Facility owned by another person."  This provision thus posits that the state and l
governments would be otherwise liable.  The failure to include the federal governme
the provision suggests that Congress did not envision liability for the federal gov
comparable to that of state and local governments, and therefore it was unnecessary
include it in the section 107(d)(2) immunity.

Of particular significance here, we stated in Rohm and Haas that the government's oversight "is intended to protect the public interest rather than the interests of those being overseen," and that therefore the government could not re its administrative costs from the regulated parties without "a clear statement of congressional intent." Id. at 1273-74. A similar analysis is appropriate here in converse of the Rohm and Haas situation, where we are considering the government's liability for payment rather than its ability to receive payment. Just as the gover oversight in Rohm and Haas was sui generis in the sense that it could not be perfor a private party, so also was the government's activity in wartime in mobilizing pri industry to produce necessary supplies.

If there were any ambiguity about the scope of the government's sovereign immunity waiver, we would be obliged to apply the generally accepted principle that waiver of sovereign immunity "must be strictly construed in favor of the United Sta and not enlarged beyond what the language of the statute requires." United States Idaho, 113 S. Ct. 1893, 1896 (1993) (emphasis added, quotation omitted). As Justi Scalia wrote for the Court:

> The foregoing [interpretations] are assuredly not the only readings of [the provision], but they are plausible ones--which is enough to establish that a reading imposing monetary liability on the Government is not "unambiguous" and therefore should not be adopted. Contrary to respondent's suggestion, legislative history has no bearing on the ambiguity point. As in the Eleventh Amendment context, the "unequivocal expression" of elimination of sovereign immunity that we insist upon is an expression in statutory text. If clarity does not exist there, it cannot be supplied by a committee report.

United States v. Nordic Village, Inc., 112 S. Ct. 1011, 1016 (1992) (citation omitt

This rule of strict construction applies even if the statute as a whole i remedial in nature. See Library of Congress v. Shaw, 478 U.S. 310, 318 (1986) (Tit VII); Pennsylvania v. National Ass'n of Flood Insurers, 520 F.2d 11, 19-20 (3d Cir.

43

(Federal Tort Claims Act), <u>overruled in part by</u> <u>Pennsylvania v. Porter</u>, 659 F.2d 30

(3d Cir. 1981) (in banc), <u>cert.</u> <u>denied</u>, 458 U.S. 1121 (1982).

Indeed, while the majority relies on CERCLA's policy of internalizing the

of waste cleanups, it ignores the countervailing policy interests that underlie the

of sovereign immunity.  As we noted in another context, when construing a waiver of

sovereign immunity we must remember that "the process of governing almost always he

some and hurts others."  <u>Sea-Land Service, Inc. v. United States</u>, 919 F.2d 888, 890

Cir. 1990) (quoting 5 K. Davis, <u>Administrative Law Treatise</u> § 27.11 (1983)), <u>cert.</u>

500 U.S. 941 (1991).  To permit courts to extract money damages from the government

its regulatory activities "would necessarily involve a very substantial, if not

prohibitive, social cost not only in terms of the imposed liability itself, but als

terms of the constraining effect of that liability on the decisions of governmental

policymakers."  <u>Id.</u>; <u>see</u> <u>also</u> Harold J. Krent, <u>Reconceptualizing Sovereign Immunity</u>

Vand. L. Rev. 1529, 1531 (1992) (Sovereign immunity "plays a vital role in our syst

is not so much a barrier to individual rights as it is a structural protection for

democratic rule.").  We concluded that "[i]n the absence of compelling evidence to

contrary, we will decline to assume that Congress intended to impose that social co

the federal government."  <u>Sea-Land</u>, 919 F.2d at 890.

In this case there is no compelling evidence demonstrating that when Cong

enacted CERCLA in 1980, or amended it in 1986, it unmistakably intended to hold the

government financially liable for the environmental consequences of its mobilizatio

domestic industry to increase production of numerous scarce products and materials

were indisputably needed in the war effort.  The government produced evidence that

World War II, executive agencies closely regulated dozens of industries across the

at least to the same degree as here.  Indeed, the government has demonstrated that

district court's opinion is already being used as the basis for numerous suits agai

44

government asserting claims for CERCLA contributions in a wide variety of industrie

arising from regulatory activity during World War II.

While it is not beyond Congress's power to do so, it is difficult to imag

that by the words of section 120 Congress intended to impose massive liability on t

United States for the environmental consequences of this regulation, running into t

hundreds of millions of dollars (estimated by the government to be between $26 and

million in this case alone), without some reference in the legislative history to i

intent to do so.  I therefore believe the district court should have granted the

government's motion for summary judgment on the ground that the waiver of sovereign

immunity contained in section 120(a)(1) of CERCLA did not encompass the activities

which FMC predicated its claim against the government for operator and arranger lia

II.

Moreover, even if Congress had not limited its waiver of the government's

sovereign immunity to liability to the same extent as that of any nongovernmental e

the district court's judgment would still be erroneous because an examination of th

relevant facts demonstrates that the activities relied on by it and the majority ar

insufficient to render the government an "operator" of the American Viscose facilit

majority's definition of "operators" for CERCLA purposes is unassailable: "operator

persons who exercise "actual and substantial control over 'the corporations's day-t

operations and its policy-making decisions.'"  Majority Typescript Op. at 28 (quoti

Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1222 (3d Cir. 19

Even the district court recognized that "'nuts-and-bolts' management decisions [are

necessary for [operator] liability under CERCLA."  FMC Corp. v. United States Dep't

Commerce, No. 90-1761, 1990 U.S. Dist. LEXIS 8902, at *10 (E.D. Pa. Jul. 18, 1990).

The facts adduced by FMC do not evince any of the essential characteristi

"operation."  Although a litany of factual conclusions adduced by the majority may

on the surface, to suggest the type of control at which the CERCLA operator liabili

45

directed, careful parsing of those conclusions demonstrates their evanescence.  The

majority summarizes the facts on which it rests its conclusion of operation as foll

(1) the government's "diver[sion of] American Viscose from its previous commercial

endeavors;" (2) the maintenance by the government of "a significant degree of contr

the production process through regulations, on-site inspectors, and the possibility

seizure" if American Viscose had not followed the government's specifications; (3)

"government built or had built plants supplying raw materials to American Viscose,

controlled these plants, arranged for an increased labor force, and supervised empl

conduct;" (4) "the government supplied machinery and equipment for use in the

manufacturing process;" and (5) "the government controlled product marketing and pr

Majority Typescript Op. at 30 (emphasis added).  I will consider each in turn, beca

believe that none of these facts individually nor all of them together sufficed to

the government an operator of the privately owned, privately financed, and for-priv

profit plant.

The diversion of "American Viscose from its previous commercial endeavors

part of the overall war effort can hardly, in and of itself, have rendered the gove

an operator of the plant.  The War Production Board (WPB), the point agency during

War II, was authorized through Executive Orders to "'[f]ormulate and execute in the

interest all measures needful and appropriate in order . . . to increase, accelerat

regulate the production and supply of materials . . . required for the national def

See FMC Corp. v. United States Dep't of Commerce, 786 F. Supp. 471, 474 (E.D. Pa. 1

(quoting Exec. Order No. 8629, 6 Fed. Reg. 191 (1941) (citing Exec. Order No. 9040,

Reg. 527 (1942)).  Its directives had the force of law.  See id. at 475.

The principal focus of the mobilization of private industry in the war ef

was to coordinate procurement policy for goods and scarce materials vital to the wa

effort and to allocate resources to ensure their availability for fulfillment of

government military contracts.  This required that firms give military needs priori

46

only if the government met regularly established prices and terms of sale.  If a manufacturer declined to give the requested priority, the government had the power over the facility for "fair and just" compensation.  It is important to emphasize t under the majority's conclusion that the arrangement by which American Viscose proc high tenacity rayon for needed tires and/or that the specification of the amount of material needed made the government an "operator," the government would literally h "operated" a large portion of the country's heavy production facilities during the Instead, for the most part it left them in private hands.

The Supreme Court itself has recognized that for the most part the goverr did not choose to "operate" private industry in the war effort.  See Lichter v. Uni States, 334 U.S. 742, 766 (1948) (Congress chose not to "convert[] the nation in ef into a totalitarian state" by operating all domestic industry and instead carefully regulated to "reach[] unequalled productive capacity and yet retain[] the maximum c individual freedom consistent with a general mobilization of effort").  The issuanc directives to American Viscose does not evidence the type of "nuts and bolts" direc management of the internal workings of the "facility" necessary to achieve operator status. See United States v. Dart Indus., Inc., 847 F.2d 144, 146 (4th Cir. 1988).

The majority's second fact, that the government maintained a "significant of control" over the production process, appears on its face to bring the governmen closer to "operator" status than any of the majority's other facts. However, when t basis for this conclusion is examined, it too falls short.  Notably, the majority c conclude, nor could it on this record, that the government exercised de facto day-t control.  After all, American Viscose management continued firmly in place.  Instea majority refers to the "possibility of seizure" by the government of the plant, wit acknowledging that the mere "possibility" could not make it an "operator" unless ar it exercised that power.  Although the potential of seizure may have had an in terr

47

effect by encouraging or coercing producers to comply with the government's require

the potential of seizure is not operation of the plant.

The "regulations" referred to but not identified by the majority in reach

conclusion do not differ in character from those applicable to all industries produ

essential products during that period.  It is a fact of life that during the war,

production of consumer goods such as nylon stockings and rayon underwear was circum

by the government, even for producers who were inclined to put frivolous consumer i

above tires and parachutes needed by the military.  It has not previously been sugg

by any court that the regulations accomplishing this made the government an operato

the plants in all of the affected industries.  Finally, the "on-site inspector" ref

to by the majority in its discussion is duplicative of the similar references made

third factual conclusion and is best understood in that context.

In examining the third of the facts on which the majority relies to demor

day-to-day control (built and controlled raw material plants, arranged for an incre

labor plant, and supervised employees), we must once again consider each of the

components.  The majority relies on the government's construction of a sulfuric aci

which it owned but leased to General Chemical Company and its sponsorship of the

construction of a carbon bisulfide plant by Stauffer Chemical Company, both of whic

provided raw materials needed by American Viscose in its production of high tenacit

rayon.  Significantly the raw materials at issue were sold to American Viscose by o

not by the government.  Moreover, although the sulfuric acid plant was adjacent to

American Viscose facility, the sulfuric acid plant was not the relevant "facility"

issue in the CERCLA cleanup.  It follows that the government's involvement in the s

acid plant's construction and operation does not impact on whether the government o

the American Viscose plant a different "facility."

Thus, the persuasiveness of the third of the majority's relevant "facts"

on the government's involvement with American Viscose's employees, which it refers

48

the summary as the government's "arrang[ing] for an increased labor force [] and supervis[ion] of employee conduct." Majority Typescript Op. at 30. To be sure, th an on-site government representative who assisted American Viscose employees in an to reduce shortages of housing and community services, and who assisted American Vi in minimizing labor strife and absenteeism, but that representative did not control workers. There is no evidence that it was anyone other than American Viscose superv who directed the productive employees in where to work within the plant, what shift work, when or if to take a vacation, what days to work, and all the details that go employee supervision.

While we agree with the majority that the government was interested in in that American Viscose increased the production of a scarce resource, it is factuall incorrect to give the impression that the government was supervising operating pers at the American Viscose plant or had an input in the firing or retention of America Viscose's employees. Instead the documents discussed by the majority, Majority Typ Op. at 32-33, reinforce the premise that while government officials were concerned the activities at the plant, their actions were in response to American Viscose's r for assistance rather than part of any overarching scheme to control the workings of plant. Thus the majority has arrived at its conclusion of day-to-day operational

---

The district court grouped a series of findings under the heading "Government On-S Presence at the Facility," FMC, 786 F. Supp. at 481, which give the erroneous impre that government personnel were supervising plant operations. In fact, the governme personnel referred to in those findings were merely supervising installation of the government-owned spinning wheels in the plant by a government selected contractor, which the government has accepted ownership responsibility. Examination of the rele documents makes clear that the references to "the project" or "on-site" are to the construction and installation of the spinning wheels. There is simply no evidence record that the government personnel supervised any American Viscose employee in connection with the production of rayon, and to the extent that any findings by the district court so suggest, they would be clearly erroneous.

For example, the majority's reliance on a WPB representative's statement that "[i] agreed on unanimously that a WPB Prio[r]ities man [is] needed on the Housing situat App. at 1720, is misplaced because the statement was the conclusion of a series of initiated by American Viscose's request for trailers to house its workers. Initial

49

by the government based on unsupported or irrelevant snippets of findings by the di

court.

The majority's fourth fact is that the government leased machinery and eq

to American Viscose. The simplest response is that the government has already acce

"owner" liability for the equipment it owned at the facility. To count these items

in assessing "operator" liability would unjustifiably conflate these two distinct k

responsibilities.

The majority's fifth and final fact is the government control of "product

marketing and price." Inasmuch as the plant was converted to high tenacity rayon f

war effort, it is not surprising that government regulations required that the proc

produced be sold to authorized companies, who in turn were also regulated in this m

As for product marketing and price, control of price over almost all production dur

that period was effected through regulations and directives of the Office of Price

Administration, and such regulation, while pervasive, is not the involvement in day

management decisions to which the CERCLA operator inquiry speaks.

One aspect of operation of a plant is conspicuously absent from the major

discussion of operation – that of profit. FMC produced no evidence that American V

---

WPB representative responded to its request by instructing another to "see that AVC
through the proper form for [the] first hundred trailers." App. at 1719. When Ame
Viscose then asked if it should prepare a site for the trailers, one WPB representa
advised them to wait for approval, while a second stated that approval would be swi
Another WPB representative explained that "[t]he assignment of a priority represent
[will be] to take an interest in this project: To break bottlenecks," to which a f
replied "A swell idea if he is a live wire." App. at 1719.

Similarly, the letter quoted by the majority between the chairman of the
the chairman of the War Manpower Commission clearly states that the WPB is seeking
coordinate preparation for staffing the expanded Facility because "in the judgment
local management and other responsible people" previous planning was inadequate. A
1746 (emphasis added).

Thus, instead of asserting significant control over the day-to-day operat
a private facility, the government attempted to ensure a coordinated response to va
requests of American Viscose, a private for-profit plant important to the war effor

50

the real operator of the plant, who chose (as fortunately did almost all of America

private industry) to go along with the governmental wartime regulation, was not ade

paid for its efforts.  The majority's suggestion that the costs of cleanup of the

hazardous wastes produced in the process of American Viscose's production should be

by society as the ultimate beneficiary of the war effort is inconsistent with CERCL

approach of treating cleanup costs as part of the cost of initial production.  Amer

Viscose produced high tenacity rayon which was installed by another producer in tir

were eventually used by the armed forces.  The fact that the government was the ult

consumer of that rayon is as irrelevant in assessing the cost of cleanup at the pla

operated by American Viscose as would be the fact that General Motors purchases and

spark plugs if there was an attempt to assess against it the cost of cleanup of any

hazardous waste generated by its independent spark plug supplier.

When examined, the totality of the government's procurement and allocatic

activities in the war effort simply did not constitute the type of "active[] and

substantial[] participat[ion] in the corporation's management" necessary for liabil

an "operator" under CERCLA.  <u>Lansford–Coaldale</u>, 4 F.3d at 1222.[0]

---

[0]Because the court is equally divided on the issue of the government's liability as
arranger, and it is our tradition not to write an opinion in that situation, I do r
forth what I believe are independent reasons to reverse the district court in that

FMC CORP. v. U.S. DEPARTMENT OF COMMERCE,

No. 92-1945

STAPLETON, Circuit Judge, dissenting:


I am uncertain whether § 120(a)(1) of CERCLA was intended to preserve the sovereign immunity of the United States in situations of this kind. The teachings Indian Towing Co. v. United States, 350 U.S. 61 (1955) suggests to me that it shoul be so construed. I am confident, however, that when Congress used the word "operat did not have in mind a governmental entity whose economic interest and involvement production facility was limited to that of a regulator and ultimate consumer. The for my confidence on this score have been thoroughly articulated in Chief Judge Slo dissent.

I, therefore, respectfully dissent and join Section II of the Chief Judge opinion.

52