

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-1999

# United States v. Occidental Chem Corp.

Precedential or Non-Precedential:

Docket 99-3084

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"United States v. Occidental Chem Corp." (1999). *1999 Decisions.* Paper 329.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/329

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 28, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-3084

UNITED STATES OF AMERICA
Appellant

v.

OCCIDENTAL CHEMICAL CORPORATION

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil Action No. 98-cv-00686)
District Judge: Honorable Malcolm Muir

Argued July 27, 1999

BEFORE: SCIRICA and STAPLETON, Circuit Judges,
and SHAPIRO, District Judge*

(Opinion Filed: December 28, 1999)

David C. Shilton
John T. Stahr (Argued)
United States Department of Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

_____

* Honorable Norma L. Shapiro, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

Ira M. Gottlieb
United States Environmental
 Protection Agency
1650 Arch Street
Philadelphia, PA 19103
 Attorneys for Appellant

Larry D. Silver (Argued)
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, PA 19103-7396
 and
Michael A. James
Associate General Counsel
Occidental Chemical Corporation
5005 LBJ Freeway
Dallas, TX 75244
 Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

After settling with Ruetgers-Nease Chemical Company ("Ruetgers"), the EPA issued a "unilateral administrative order," pursuant to S 106 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. S 9606, requiring Occidental Chemical Corporation ("Occidental") to assist in the financing and implementation of remedial response actions at the Centre County Kepone Superfund site. The District Court granted Occidental's motion to dismiss, concluding that Ruetgers' commitment to clean up the site and reimburse the Superfund for past response costs precluded the EPA from obtaining any relief from Occidental. We will reverse the judgment of the District Court and remand the case for further proceedings.

I.

This case arises from the EPA's efforts to compel potentially responsible parties ("PRPs") under CERCLA to

conduct a cleanup at the Centre County Kepone Superfund
Site in State College, Pennsylvania. Two PRPs are relevant
to this appeal: Ruetgers, the site owner, whom EPA alleges
is liable under S 107(a)(1) of CERCLA, and Occidental,
whom EPA alleges is liable under S 107(a)(3) for "arranging
for the disposal" of hazardous substances at the site. 42
U.S.C. S 9607(a)(1) and (3).[1] Since 1958, Ruetgers and its
predecessor, Nease Chemical Company ("Nease"), have
owned the Centre County Kepone site and have
manufactured a variety of chemicals there. During a period
in 1973 and 1974, Occidental's predecessor, Hooker
Chemical Company ("Hooker"), contracted with Nease for
the manufacture of a pesticide. Under their agreement,
Hooker provided Nease with the raw materials and the
formula for manufacturing the pesticide and paid Nease to
manufacture the product, which involved the generation
and disposal of hazardous substances on the site.

In 1983, the Centre County Kepone site was listed on the
National Priorities List, and in 1988, EPA entered into an
administrative order with Ruetgers, who agreed to perform
a remedial investigation/feasibility study, which was
completed in 1992. In 1995, after dividing the remediation
into two "operable units," EPA signed a "record of decision,"
announcing the selected remedial action for thefirst
operable unit ("OU-1").[2]

_____

1. The "arranger" theory of liability wasfirst recognized in United States
v. Aceto Agricultural Chemicals Corp., 872 F.2d 1373 (8th Cir. 1989)
(where A accepts a hazardous substance that is owned by B, and
incorporates it into a commercial product for B's benefit and at B's
direction, and hazardous substances are disposed of in the process, B
has "arranged for the disposal of hazardous substances" under
S 107(a)(3)). We considered the viability of the Aceto theory in FMC Corp.
v. United States Dept. of Commerce, 29 F.3d 833 (3d Cir. 1994) (en banc),
but we neither accepted nor rejected it as a basis for liability. See id.
at
846 ("[t]he court is equally divided on this point"). The validity of the
Aceto theory is not currently before us.

2. "OU-1 consists of contaminated ground water, surface water, soils,
and sediments on the Site, as well as soil/sediment sampling of the 15-
acre former spray field area and riparian areas of nearby Spring Creek.
OU-2 will address soils and sediments from the sprayfield, Spring
Creek, and a second nearby creek." App. 12-13 (Complaint P 24).

3

Pursuant to S 122(e), 42 U.S.C. S 9622(e), EPA served both Ruetgers and Occidental with "special notice letters," which set forth EPA's basis for their liability and invited a good faith offer of settlement. Following receipt of the letter, Ruetgers began negotiating with EPA regarding the remedial work for OU-1. In 1996, EPA entered into a Consent Decree with Ruetgers in which Ruetgers agreed to perform the remedial work for OU-1 and to pay $293,895 in past response costs in settlement of its liability with respect to OU-1.

EPA's efforts to negotiate with Occidental, however, were unsuccessful. When negotiations with Occidental failed, EPA, finding that the Centre County Kepone Site presented an imminent and substantial endangerment, issued a unilateral administrative order ("UAO"), pursuant to S 106 of CERCLA, 42 U.S.C. S 9606, requiring that Occidental jointly implement the OU-1 remedy with Ruetgers. Specifically, the Order stated that Occidental is subject "to the same terms and conditions set forth in the Ruetgers Consent Decree with respect to financing and implementing the response actions" at the Centre County Kepone site. App. 136. It further provided:

> [Occidental's] obligations under this Order may be fulfilled by jointly fulfilling with [Ruetgers] the obligations under the . . . proposed Consent Decree, Civil Action No. 4: CV-96-2128. To the extent that any portion of the Work is undertaken by [Ruetgers], [Occidental] is not excused from performing under the present Order and is severally liable for all obligations set forth herein and for ensuring that the Work be completed in a manner consistent with the NCP, CERCLA and all applicable federal, state and local laws.

App. 151.

Under S 106(a), if EPA finds an "imminent and substantial endangerment to the public health or welfare or the environment," it is authorized to "issue such orders as may be necessary to protect public health and welfare and the environment." 42 U.S.C. S 9606(a). If the ordered party fails to comply with the order "without sufficient cause,"

4

CERCLA provides for severe penalties -- i.e., up to $25,000 per day of noncompliance, see id. S 106(b)(1), plus treble damages, see id. S 9607(c)(3). CERCLA provides, however, that, if the ordered party is not liable, or demonstrates that the ordered action was arbitrary and capricious, it may obtain reimbursement of costs expended in compliance with the order, plus interest. See id. SS 9606(b)(2)(A)-(E). In addition, under S 106(b)(1), an ordered party may avoid the imposition of fines or penalties if it has "sufficient cause" for its refusal to comply with the order.3

In this case, Occidental informed EPA it would not comply with the S 106 order, and EPA filed this action in District Court to enforce its order. EPA's Complaint seeks (1) an injunction ordering Occidental to comply with the order; (2) certain past costs not recovered from Ruetgers; (3) civil penalties; (4) punitive damages; and (5) a declaratory judgment of liability for future costs incurred at the site.

Occidental moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6). Occidental argued that EPA has already obtained "complete relief" from the Ruetgers Consent Decree and, therefore, is precluded from pursuing Occidental for the same relief. To find otherwise, Occidental argues, would permit EPA to obtain a double recovery, which is impermissible both under CERCLA and common law. The District Court agreed and dismissed EPA's Complaint. The District Court then denied a subsequent motion for partial reconsideration. EPA now appeals. We exercise plenary review of a grant of a motion to dismiss, accepting all allegations in the Complaint as true and drawing all reasonable inferences in the light most favorable to the plaintiff. See Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997).

II.

CERCLA provides a complex statutory scheme for the cleanup of the nation's hazardous waste sites. Although EPA has several alternative strategies for achieving the

_____

3. The issue of whether Occidental has sufficient cause not to comply with EPA's UAO is not currently before us.

5

statute's objective, each ultimately involves "forc[ing] polluters to pay for costs associated with remedying their pollution." United States v. Alcan Aluminum Corp., 964 F.2d 252, 257-58 (3d Cir. 1992). In FMC Corp. v. Dept. of Commerce, 29 F.3d 833, 843 (3d Cir. 1994), this Court noted "CERCLA's broad remedial purposes" and cited as "most important[ ]" CERCLA's "essential purpose of making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created."

To this end, CERCLA provides EPA with a variety of tools for achieving the efficient and cost-effective cleanup of the nation's hazardous waste sites. First, under S 104(a) EPA itself can conduct the remedial work at a site, using the Superfund, and then sue the potentially responsible parties under S 107 to recover its costs. EPA may sue one or all of the PRPs involved at a given site, as each PRP is jointly and severally liable for all response costs that are"not inconsistent with the national contingency plan." 42 U.S.C. S 9607(a)(4)(A). Second, under S 106(a), if EPA determines there is an "imminent and substantial endangerment to the public health or welfare," it may order PRPs to undertake the remedial work in the first instance, either by obtaining injunctive relief in a District Court or by issuing such administrative orders "as may be necessary to protect public health and welfare and the environment." 42 U.S.C. S 9606(a).

Finally, S 122 of CERCLA expressly provides that "whenever practicable and in the public interest . . . [EPA] shall act to facilitate agreements . . . in order to expedite effective remedial actions and minimize litigation." 42 U.S.C. S 9622(a). It is through S 122 that PRPs may agree, as opposed to being ordered under S 106(a), to do the remedial work at a site in the first instance. While EPA has the discretion to decide which PRPs to pursue for performance of the remedy or recovery of its past costs, and thus is authorized to pursue fewer than all PRPs at a given site, the statute expressly permits PRPs to sue other liable parties for contribution. See 42 U.S.C.S 9613(f)(1).

Some settlements between PRPs and EPA, like the Ruetgers Consent Decree, involve agreements to do work,

while others are "cash out" settlements in which a party pays a portion of the past, or future, response costs in exchange for a release from liability. See id. SS 9622(g), (h). In either case, settlements with the United States under CERCLA typically include a covenant not to sue and contribution protection for matters addressed in the settlement. See id. SS 9622(f), (h)(4); 9613(f)(2). In exchange, the government typically retains "settlement re-openers" for remedy failure, unforeseen conditions, and other contingencies.

III.

Section 122 of CERCLA authorizes the EPA to enter into a settlement agreement requiring one or more PRPs to conduct a cleanup and goes on to provide that the agreement "shall be entered in the appropriate district court as a consent decree." 42 U.S.C. SS 9622(a), (d)(1)(A). Subsection (c)(2) of S 122 expressly provides that entering into such a settlement shall not preclude the EPA from taking action under S 106 against any PRP who is not a party to the settlement or from suing such a PRP under any provision of the Act:

> If an agreement has been entered into under this section, [EPA] may take any action under section 106 of this title against any person who is not a party to the agreement, once the period for submitting a proposal under subsection (e)(2)(B) of this section[i.e., a 60-day negotiation period following the issuance "special notice" letters which call for the PRPs' submission of "good faith offers"] has expired. Nothing in this section shall be construed to affect . . .
>
> (B) The authority of [EPA] to maintain an ac tion under this chapter against any person who is not a party to the agreement.

42 U.S.C. S 9622(c)(2).4 As we have noted, S 106 authorizes
_____

4. Subsection (c)(2)(A) provides that nothing in S 122 shall affect "the liability of any person under sections 106 and 107 .. . with respect to any costs or damages which are not included in the agreement." This

the EPA to enter administrative orders and to bring suits, like the instant one, to enforce such orders. Section 122(c)(2)(B) would, thus, appear to provide express authority for the EPA's suit against Occidental. Occidental, however, would have us seize on a provision from CERCLA's contribution section as limiting the EPA's authority to sue non-settling PRPs under S 122(c)(2)(B). Section 113(f)(3)(A) provides:

> If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

42 U.S.C. S 9613(f)(3)(A) (emphasis added).

Occidental argues that the Consent Decree affords EPA complete relief and, therefore, that EPA is barred from ordering Occidental to assist in the OU-1 remedy with respect to both past response costs and remedial work. The District Court agreed and held that allowing EPA to order Occidental to assist in paying for and performing the cleanup of OU-1 would give the EPA a double recovery in contravention of both CERCLA and the common law.

The Government does not dispute that S 113(f)(3) permits it to pursue non-settlors only where the relief it has obtained in settlements with others is "less than complete." Indeed, the Government agrees that it is permitted "but one satisfaction" of a claim and that, once a claim is "satisfied," all other joint tortfeasors are released. The Government insists, however, that merely signing the Ruetgers Consent Decree, in which Ruetgers agreed to perform work in the future, does not constitute "satisfaction" of its claim and, thus, does not mean the Government has "obtained"

_____

provision is not addressed specifically to the rights of non-settling parties. It is intended to "make clear" that S 122 does not affect the liability of settling or non-settling parties "for matters not covered by the
agreement." H.R. Rep. No. 99-253(V), at 61 (1985), reprinted in 1986 U.S.C.C.A.N. 3124, 3184.

8

complete relief. Quite the contrary, the Government argues that it has obtained complete relief only when "the endangerment providing the basis for EPA's S 106(a) authority has been abated." Brief for Appellant at 16.

As a matter of textual analysis, it is possible to read S 113(f)(3)(A) in isolation as terminating the government's right to sue when it has secured a legally enforceable right to complete relief against one PRP. Nevertheless, we believe that the government's reading of that section is not only permissible from the standpoint of textual analysis,5 but also fits more comfortably in the statutory scheme and its common law background. Moreover, to the extent there is an ambiguity, we conclude that we are bound to defer to the EPA's reasonable understanding of the statute.

IV.

It seems to us not only that S 122 provides express authority for the actions the EPA has taken with respect to Occidental, but also that its principal purpose is to make sure the authority to issue administrative orders and enforce them is preserved in situations like this where a settlement agreement has been entered with another PRP.6

Subsection 113(f)(3)(A) has a different purpose, one not directly related to the issue before us. Section 113(f) is

_____

5. Contrary to Occidental's suggestion, the clause "in an administrative or judicially approved settlement" does not modify "complete relief." Rather, it modifies "a person who has resolved its liability." Accordingly, the text of S 113(f)(3)(A) does not expressly answer whether "complete relief " refers to a legally enforceable right to such relief or to a satisfaction of that right.

6. We reject Occidental's suggestion that S 122(c)(2) authorizes only the issuance of administrative orders following a settlement with one PRP and not suits to enforce such orders. First, S 122(c)(2) incorporates without reservation "any action under section 106," and S 106(a) authorizes suits to enforce administrative orders. Second, S 122(c)(2)(B) expressly preserves the right of the government to sue other PRPs. Finally, we feel confident that Congress did not intend to authorize administrative orders against a person who was not a party to a settlement and, at the same time, deny the EPA the authority to enforce those orders in court.

entitled "Contribution." Subsection (1) of that section recognizes the right of PRPs who have settled or been found liable to seek contribution from other PRPs. Subsection (2) next stipulates the effect that a settlement between the EPA and a PRP will have on rights of contribution. It is in this context that one finds subsection (3), entitled "Persons not a party to settlement." The purpose of subsection (3)(A), which we have quoted above, is to make clear that the right of contribution possessed by a PRP, who has settled with the EPA, against other PRPs does not preclude the EPA from suing other PRPs.

In this context, we think it highly unlikely that the initial clause of S 113(f)(3)(A), so heavily relied upon by Occidental -- "[i]f the United States or a State has obtained complete relief " -- was intended to limit the otherwise unqualified, express authority to sue non-settling PRPs conferred by SS 106 and 122(c)(2). It seems far more reasonable to read that clause as recognition of the obvious fact that if the cleanup has been fully accomplished and paid for, the government is entitled to no further relief.7

This latter reading of the disputed clause is consistent with the prohibition against double recovery found in the common law. The Restatement of Judgments provides that a "judgment against one person liable for a loss does not terminate a claim that the injured party may have against another person who may be liable therefor." Restatement (Second) of Judgments S 49 (1982). The Commentary then explains that "[d]ouble recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." Id. S 49 cmt. a. Indeed, we recently affirmed that under Pennsylvania law, which follows the common law rule, "[t]he `one satisfaction' rule bars a subsequent suit against another tortfeasor only where the prior proceedings can reasonably be construed to have resulted in full satisfaction of the plaintiff's claim." Greenleaf v. Garlock, Inc., 174 F.3d 352, 357 (3d Cir. 1999)

_____

7. The legislative history identified by Occidental suggests to us no more than that Congress intended there to be no double recovery by the government, an intention that is satisfactorily accommodated by the EPA's reading of S 113(f)(3).

10

(quoting Frank v. Volkswagenwerk, A.G., 522 F.2d 321, 326 (3d Cir. 1975)). EPA's argument that it has not obtained "complete relief " until the endangerment has been abated -- i.e., its claim has been fully "satisfied" -- is, thus, consistent not only with CERCLA's language and objectives but also with the common law.

Support for the EPA's reading of S 113(f)(3)(A) can be found in other CERCLA provisions as well. Section 122(f)(3) provides that a covenant not to sue for liability as to future costs at a site shall not even take effect until EPA certifies "that the remedial action has been completed." 42 U.S.C. S 9622(f)(3). Similarly, S 122(f)(5) states that any covenant not to sue "shall be subject to satisfactory performance" by the settlor. If, as Occidental insists, S 113(f)(3)(A) terminated the EPA's authority to sue a PRP whenever it entered a settlement agreement with another PRP, the statute would favor non-settling parties by shielding them fromS 106 actions prior to completion of the work and abatement of the endangerment while denying such protection to the settling party.

Moreover, we believe the EPA's understanding makes sense as a practical matter. The existence of a settlement (often imposing on the settlor a multi-year, multi-million dollar obligation) does not guarantee that the settlor will successfully complete all the promised work. It would overlook this simple fact to suggest, as Occidental does here, that although all PRPs are jointly and severally liable for the cleanup, once a single PRP settles, EPA is foreclosed from pursuing any other PRP under S 106, despite its finding that a imminent and substantial endangerment exists. Occidental's proposed reading of S 113(f)(3)(A) would reward recalcitrant parties, thereby discouraging settlements. Cf. B.F. Goodrich v. Betkoski, 99 F.3d 505, 527 (2d Cir. 1996) (the "usual federal policy encouraging settlements is even stronger in the CERCLA context"); 42 U.S.C. S 9622(a) ("whenever practicable and in the public interest . . . [EPA] shall act to facilitate agreements . . . in order to expedite effective remedial actions and minimize litigation"). By bringing more parties into the cleanup effort, EPA protects itself against the risk that any one party may become unable or unwilling to perform the remedy as EPA

11

instructs. Thus, by issuing administrative orders to non-settling PRPs under S 106, EPA fulfills CERCLA's objectives of promoting fairness at multi-party sites, increasing the likelihood of settlements, and accelerating the statute's ultimate goal -- site cleanup.

Finally, we note that Occidental does not contest that EPA may enter separate consent decrees with multiple parties requiring joint implementation. Nor does it argue that the EPA may not issue separate Section 106 orders to multiple parties requiring joint implementation. Yet, Occidental has suggested no persuasive reason why Congress might have wished to authorize these strategies and, at the same time, deny the EPA authority to do what it did here -- propose to two PRPs that they jointly implement a cleanup, settle with the one that is willing to settle, and order the non-settling PRP to assist.8

V.

In the final paragraph of its opinion, the District Court adopted a related alternative ground for its ultimate conclusion, one based on S 106(a) rather thanS 113(f)(3)(A). Because the EPA, in its view, had received "complete relief " by entering the Ruetgers settlement, the District Court held that the S 106 order directed to Occidental was not "necessary to protect public health and welfare and the environment" as required by S 106(a). Reading S 106(a) as a whole,9 it seems clear that the question of whether an order

_____

8. Occidental does point out that it is in a different position than it would have been had two S 106 orders been entered. Under S 113(f)(2), a PRP that has settled is not "liable for claims for contribution regarding matters addressed in the settlement" and the amount paid by the settling party only "reduces the potential liability of the other[ ]" PRPs. As a result, Occidental posits that if it should wind up paying for "more than its fair share" of the costs of the cleanup, it would not be able to obtain contribution from Ruetgers. While this is true, it is the result of a deliberate policy choice made by Congress in order to encourage settlements. As explained in B.F. Goodrich v. Betkoski, 99 F.3d 505, 527 (2d Cir. 1996), the intended effect of S 113(f)(2) is that "non-settling defendants may bear disproportionate liability for their acts."

9. Section 106(a) provides in its entirety:

12

may be necessary to protect public health, welfare, and the environment goes to the status of the contamination at the site, not to who is, or who is not, obligated to address it. See 42 U.S.C. S 9606(a) ("[the President] may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat"). Accordingly, we do not find a limitation on the unqualified, express authority conferred by S 122 latent in the "necessary" requirement of S 106(a). Here, the EPA's Order appropriately documented the presence of hazardous substances at the site and their likelihood of endangering public health, thereby satisfying the "necessity" requirement of S 106(a).

VI.

Even if we were not fully persuaded that this suit is authorized by S 122(c)(2), however, we would not be at liberty to reject the EPA's position. Section 113(f)(3)(A), at most, creates an ambiguity and, where ambiguity exists, we are constrained to defer to the interpretation of the agency that has been charged with administering the statute. We recently summarized the standard of review as follows:

> When reviewing an agency's construction of a statute, if the intent of Congress is clear, then we must give effect to that intent. If the statute is silent or

_____

> In addition to any other action taken by a State or local government,
>> when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the
>> equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

42 U.S.C. S 9606(a).

13

ambiguous with respect to a specific issue, then a
deference standard applies, and the question for the
court becomes whether the agency's answer is based
on a reasonable construction of the statute.

Connecticut Gen. Life Ins. Co. v. Comm'r, 177 F.3d 136, 143
(3d Cir. 1999) (quoting Sekula v. FDIC, 39 F.3d 448, 451-52
(3d Cir.1994)).

The Supreme Court caselaw teaches that we must defer
to agency interpretations that are supported by
"regulations, rulings, or administrative practice." Bowen v.
Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988); see also
Bragdon v. Abbott, 524 U.S. 624, 642 (1998) ("the well-
reasoned views of the agencies implementing a statute
`constitute a body of expertise and informed judgment to
which courts . . . may properly resort for guidance")
(quoting Skidmore v. Swift & Co., 323 U.S. 134, 139-40
(1944)); Auer v. Robbins, 519 U.S. 452, 462 (1997)
(deferring to agency interpretation where there was"no
reason to suspect that the interpretation does not reflect
the agency's fair and considered judgment on the matter in
question"). We, thus, must defer not only to those
interpretations supported by notice-and-comment
rulemaking but also to interpretations that find support in
informal agency practice. In Cleary v. Waldman, 167 F.3d
801, 808 (3d Cir. 1999), we articulated the rule governing
deference to informal interpretations as follows: "[I]f an
agency has been granted administrative authority by
Congress for a statute, its interpretation -- despite arising
in an informal context -- will be given deference as long as
it is consistent with other agency pronouncements and
furthers the purposes of the Act."

As evidenced by the EPA's policy documents, it has long
been its practice under S 106 to issue administrative orders
to non-settling parties, even after a consent decree has
been reached with another PRP for the performance of the
remedial work at a site. In a 1996 Policy Memorandum, the
EPA spoke as follows on the issue:

Regional staff are required to prepare appropriate
documentation for decisions not to issue UAOs to late-
identified PRPs -- i.e., PRPs who are identified after

14

other PRPs assume the obligation to conduct the response action. (Headquarters recently distributed model UAO language requiring late-identified PRPs to "participate and cooperate" with PRPs already conducting the cleanup pursuant to either a settlement agreement or an earlier UAO. It is similar to the "coordinate and cooperate" language contained in "parallel UAOs," . . . although those orders are for already-identified PRPs who are recalcitrant and refuse to joint other PRPs who are signing a consent decree.)

EPA Memorandum, Documentation of Reason(s) for Not Issuing CERCLA S 106 UAOs to All Identified PRPs at 5 (Aug. 2, 1996) (emphasis added); see also Walter E. Mugdan (EPA Deputy Regional Counsel), The Use of CERCLA Section 106 Administrative Orders to Secure Remedial Action, American Law Institute, C948 ALI-ABA 113 (1994) ("settlements, . . . coupled with subsequent unilateral orders . . . against non-settlors, are ways for the government to create an environment in which volunteerism is promoted and a sense of fairness among the volunteers is enhanced").10

EPA is clearly charged with administering CERCLA, and the policy memoranda quoted above indicate that its administrative practice is consistent with the interpretation it has proffered here. Therefore, following the rule announced in Cleary, we must defer to the EPA's interpretation of S 113(f)(3)(A), provided it is based on a reasonable construction of that provision and is consistent with the purposes of CERCLA. See Cleary, 167 F.3d at 806 (deferring to agency's statutory construction as stated in policy memoranda). For the reasons set forth in the preceding section, we cannot characterize the EPA's

_____

10. The policy discussed in this policy statement goes back at least to 1990. See, e.g., EPA Memorandum, Guidance on CERCLA Section 106(a) Unilateral Administrative Orders (Mar. 7, 1990) (described in EPA Memorandum of August, 1996) ("When a complete settlement agreement is reached for conduct of the remedial action with fewer than all PRPs, the Agency may agree to issue `parallel' unilateral orders to the liable non-settlors. Parallel unilateral orders direct the non-settlors to coordinate and cooperate with the settlors' cleanup activities, as described in the consent decree.").

15

interpretation as unreasonable. It follows that the District Court's reading of the statute must be rejected.[11]

VII.

Applying the aforementioned legal precepts to the facts of this case, we conclude that the District Court erred in dismissing the EPA's Complaint. As far as the remedial work is concerned, Occidental concedes that, although Ruetgers has agreed to perform all of the work, it has not yet done so. Therefore, EPA has "obtained less than complete relief " and is expressly authorized by SS 106 and 122 to issue an administrative order to Occidental, requiring that it jointly perform the necessary work.

With respect to the past response costs, the result is the same. The District Court interpreted the Ruetgers Consent Decree as reimbursing the United States for all  past response costs. Since the Ruetgers' commitment included reimbursement of all of the EPA's past response cost, the Court reasoned that it had obtained "complete relief" and that any recovery of past response cost in this action would constitute an impermissible double recovery. If the EPA in fact incurred more past response costs than the $293,985.10 mentioned in the Decree, its remedy was to sue Ruetgers.

Although we have reservations about the District Court's

_____

11. Contrary to Occidental's suggestion, we are not deferring to the EPA's litigation position, but to policy memoranda consistent with that position. The EPA's "position is in no sense a`post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." Auer, 519 U.S. at 912 (quoting Bowen, 488 U.S. at 212) (deferring to agency's construction of a regulation even though that "interpretation comes to us in the form of a legal brief "); see also Molinary v. Powell Mountain Coal Co., 125 F.3d 231, 235 n.4 (4th Cir. 1997) ("the fact that the Secretary's interpretation of the statutory language at issue comes to us in the form of a legal brief `does not, in the circumstances of this case, make it unworthy of deference' ") (quoting Auer). Because we see "no reason to suspect that the [EPA's] interpretation does not reflect the agency's fair and considered judgment on the matter in question," we will defer to its interpretation. Auer, 519 U.S. at 462.

16

construction of the Consent Decree, we see no need to construe it here. Whether or not the Consent Decree was negotiated, as Occidental maintains, with the understanding that the EPA's past response cost totaled $293,985.10, any agreement on that score between the EPA and Ruetgers clearly does not operate to the benefit of Occidental. The complaint in this suit alleges that the EPA has incurred past response costs of $491,637, and we are required at this stage to credit that allegation. See Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997). If Occidental is shown to be a responsible party, it will be jointly and severally liable for those costs. Even assuming that it is entitled to a $293,985.10 credit for the past response costs previously paid by Ruetgers, Occidental will owe the balance.12

## VIII.

In Count V of its Complaint, the EPA sought a declaratory judgment, "holding Occidental liable in future actions to recover further costs incurred at or in connection with the site." The District Court dismissed the entire Complaint without separately addressing this Count. The EPA argues here that the District Court "erred in dismissing Count V insofar as it requested a declaratory judgment for future costs not just as to the first operable unit, but as to the second operable unit." Brief for Appellant at 30 (emphasis added.)

The District Court read the Complaint narrowly, explicitly noting that "the present action against Occidental only deals with Operable Unit One." Dist. Ct. op. at 4. The EPA did not seek to clarify this alleged error in its motion for reconsideration. Moreover, as Occidental argues, in Count V of the Complaint, the EPA cites to S 122(g)(2), which sets forth the statute of limitations for cost recovery actions under S 107 and explicitly requires a trial court to enter a

_____

12. While both sides agree that the EPA cannot receive a double recovery, the parties have not briefed whether this principle should be applied on the basis of discrete categories of response costs, the total cleanup costs, or in some other manner. We accordingly express no opinion on those issues.

declaratory judgment on liability for future response costs if liability is found for past response costs. Thus, it is understandable that the District Court, having erroneously concluded that Occidental had no liability for EPA's outstanding past costs associated with OU-1, dismissed the S 122(g)(2) claim for a declaratory judgment as to future costs associated with OU-1.

The case will be remanded for a determination of Occidental's liability for future costs as to OU-1. With respect to the future costs associated with OU-2, we agree that the Complaint, read as a whole, did not give fair notice of a claim for future response costs associated with OU-2. The EPA points our attention to two statements made in its brief in opposition to Occidental's motion to dismiss, but those statements refer only to the scope of the Ruetgers Consent Decree, not the scope of the declaratory judgment claim against Occidental. There was simply nothing in the pleadings or the record in the District Court that served to alert the District Court to the claimed broader scope of Count V. We hold, therefore, that any claim with respect to OU-2 was not before the District Court and is not before us now.13

IX.

The judgment of the District Court will be reversed, and the case will be remanded to the District Court for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

13. To the extent the EPA wishes to include a count seeking future costs associated with OU-2, it is free to seek leave to amend its Complaint in the District Court. See Fed. R. Civ. P. 15(a).

18